**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **1220, LLC,** | |
| **Plaintiff,** | |
| **v.** | |
| **TILTED KILT FRANCHISE OPERATING, LLC,** | |
| **Defendant,** | **Related to Case No. 15-cv-10377** |
| | **Jury Trial Demanded** |

<u>**COMPLAINT**</u>

Now comes 1220 LLC, as Plaintiff, and for its Complaint against Defendant TILTED KILT FRANCHISE OPERATING, LLC ("TKFO") alleges as follows:

<u>**PARTIES**</u>

1.      Plaintiff 1220 LLC ("1220") is an Illinois limited liability company having its principal place of business in Rolling Meadows, Illinois.  The members of 1220 are Robert Baroud, Emil Baroud, Anthony Baroud, and Peter Baroud.  Each member of 1220 is a resident of the State of Illinois.

2.      Defendant Tilted Kilt Franchise Operating, LLC ("Tilted Kilt" or "TKFO") is a Wyoming limited-liability company with its principal place of business in Tempe, Arizona.  On information and belief based on the allegation made by TKFO in ¶ 7 of its Complaint in related case no. 15-cv-10377 in this District: "None

1

of [TKFO's] members is a citizen or resident of the State of Illinois." (See case no. 15-cv-10377 Dkt. #1, p. 3).

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

3.     The Court has original jurisdiction over this action under 28 U.S.C. §1332(a), as the amount in controversy exceeds the sum of $75,000 exclusive of interest or costs, and, as alleged in ¶¶ 1 and 2 of this Complaint, the parties are citizens of different states.

### Personal Jurisdiction

4.     The Defendant is subject to personal jurisdiction in the State of Illinois because it sells franchises in Illinois, and therefore is "doing business" in Illinois and is subject to suit here pursuant to long-arm jurisdiction under 735 ILCS 5/209.

5.     In addition, as plaintiff in related case no. 15-cv-10377 in this District, the Defendant has voluntarily submitted to personal jurisdiction in Illinois with respect to the dispute in this case, and has therefore waived any objections to being sued in this District on the Complaint alleged herein.

### Venue

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because substantial portions of the unlawful conduct alleged herein occurred in the Northern District of Illinois, Eastern Division.

## FACTUAL BACKGROUND

7.     Since 2005, TKFO has been the franchisor of the nationwide chain of franchised Tilted Kilt Pub and Eatery restaurants, which TKFO describes as being Celtic-themed sports and entertainment bars and restaurants.  As TKFO states in its most recent Franchise Disclosure Document (FDD) that it published in compliance with applicable state and federal laws that govern the sale of franchises:

> The [Tilted Kilt] Restaurants offer dinner entrées, traditional pub food, hamburgers, salads and pizza made with fresh, quality ingredients, accompanied by full bar service, served up by uniquely kilt-clad wait staff in a lively, Celtic-themed atmosphere with numerous large screen televisions featuring sports programming. TILTED KILT Restaurants operate using our distinctive entertainment and business format, systems, methods, procedures, designs, layouts and specifications ("Licensed Methods") and under our service mark "TILTED KILT" and related logos, trademarks, service marks and commercial symbols ("Marks"). The cornerstone of the Tilted Kilt concept is the "Tilted Kilt Girls;" female servers chosen for their attractiveness, intelligence, and outgoing personalities. The Tilted Kilt Girls, dressed in trademarked kilt-clad costumes, entertain and interact with guests while serving food and drinks.
>
> The Restaurants are typically between 5,000 and 8,000 square feet, in leased or owned restaurant space. The distinctive décor of a TILTED KILT Restaurant features walls lined with Irish, Welsh and Scottish curiosities. The Restaurants have big screen televisions placed throughout the Restaurant for convenient viewing. The casual atmosphere is friendly and decidedly lively and entertaining, with games and music customarily associated with a sports entertainment bar, but with a high degree of emphasis on providing tasty, high-quality menu offerings. The TILTED KILT Restaurant features a standardized and an optional menu, of dinner entrées, traditional pub food, hamburgers and other grilled specialties, hot and cold sandwiches, chicken, salads, pizza and, typically, full bar service. TILTED KILT Restaurants are customarily designed to seat over [sic] approximately 150 to 250 customers inside, with additional outdoor seating capability also recommended.

Tilted Kilt Franchise Disclosure Document, dated March 27, 2015, at 1-2 (hereinafter "FDD").

8.      TKFO requires each franchisee to agree to establish and operate its Tilted Kilt restaurant/pub in compliance with its Franchise Agreement such that, as TKFO has further explained in its FDD, it is "mandatory that [franchisees] comply with the standards and specifications contained in an operations manual" that TKFO provides to the franchisee, in "the form of one or more manuals (*i.e.*, Pub Operations & Systems and Marketing Manuals), technical bulletins or other written materials (collectively, the 'Operations Manual')" which TKFO reserves the right to "modify." (FDD at 14).

9.      As TKFO further explains in its FDD, TKFO reserves the right to provide its franchisees with "mandatory standards and specifications for the menu items and retail products and related services offered at or through [a franchised] TILTED KILT Restaurant and for the Franchised Location, equipment, furniture, fixtures, menus, food, packaging, paper products, employee attire, supplies, forms, advertising material, décor, music and other items used at [a franchised] Restaurant." (FDD at 14).

10.     As TKFO is aware based on the disclosures that it has made in its FDDs, the market for both fast casual dining and for sports bars is well established and highly competitive such that TKFO has always been fully aware of the need to be vigilant in promoting and strengthening the Tilted Kilt brand.

11.     At all times since it began offering franchises in 2005, TKFO has been aware that having good advertising and marketing programs in place is vital for a brand such as Tilted Kilt to be competitive in the marketplace.  To this end:

a. TKFO provides in its Franchise Agreements that each franchisee will be required to expend defined amounts of its revenue on local marketing. To make the local marketing expenditures as effective as possible, TKFO reserved the right in each of its franchise agreements to create "Local Advertising Groups" ("LAGs"), whereby franchisees in defined markets (such as the greater Chicago market) would be able to pool their advertising expenditures to support market-wide advertising and marketing programs in ways that would be calculated to maximize brand presence and brand value in the respective local markets.

b. TKFO also requires each franchisee to contribute to a national advertising fund that TKFO would administer.

12. TKFO structures its franchise agreements to provide that it will receive revenue from multiple sources, including: initial franchise fees paid by the franchisee at the time the franchise is purchased; ongoing royalties that are calculated as a percentage of the franchisee's gross revenues (without regard to whether the franchise is profitable); and additional revenue that may be derived from franchisee purchases of "products, services, equipment and supplies" that franchisees may be required to purchase from suppliers designated by TKFO and who may enter into agreements with TKFO to share with TKFO portions of the amounts paid by the franchisees.

13. In all of the ways described above, and without limitation, TKFO has enormous discretion and the potential to exert enormous influence and control over

whether individual Tilted Kilt franchises may be operated at a profit and be attractive investment opportunities for qualified franchisees.

14.     In addition to offering franchises to persons or entities that wish to own and operate their own Tilted Kilt restaurants/pubs on the terms that are generally described above, and as further explained by TKFO in its FDD, TKFO also offers:

> franchises for Area Developer businesses in which an area developer ("Area Developer") acts as an independent franchise sales and support representative within a defined geographic area to identify and solicit prospective Restaurant franchisees, to assist franchisees in locating sites for TILTED KILT Restaurants within that area and to provide additional support before, during and after the Restaurant opens.

(FDD at 2).

15.     On or about July 30, 2007, 1220 and TKFO entered into a written contract entitled Area Developer Agreement ("AD Agreement"). A true and correct copy of the AD Agreement is submitted as Exhibit A to this Complaint and is expressly incorporated herein. Under the AD Agreement and in connection with that Agreement:

> a. TKFO is the franchisor of the Tilted Kilt franchise system and 1220 is an area developer with responsibility for performing specific duties delegated to it by TKFO within a defined territory that is comprised of 29 counties located in Northern Illinois, Southern Wisconsin and Northwest Indiana.

> b. The initial term of the AD Agreement is twenty-five years, such that the AD Agreement will not expire until July 30, 2032, with an option

on the part of the Area Developer to renew for an additional 10 year term as long as it is in substantial compliance with its obligations under the AD Agreement.

c.  1220 paid $150,000 to TKFO for the privilege of becoming an area developer.

d.  1220 also made a commitment to expend its own money pursuant to a defined formula (a requirement to spend a minimum of $600 per 1,000,000 persons residing in the defined territory during each calendar six month period) to promote the sale of Tilted Kilt franchises in the territory.

e.  1220 made a substantial commitment of time, on the part of its members and/or their employees, to perform its contractual duties to TKFO under the AD Agreement, including the required efforts to sell and develop new franchises, and to provide extensive services to new and existing franchisees that TKFO agreed to provide in its respective franchise agreements, but which TKFO delegated to its area developer to perform in its stead.

f.  1220 made a commitment to develop a definite minimum number of Tilted Kilt restaurants in its defined territory within defined time periods; and 1220 accepted the risk that it would forfeit its investment if it failed to meet the minimum development targets.

16.     In entering into the AD Agreement, 1220 sought to achieve a return on its investment of dollars and time.  Under the AD Agreement, the Area Developer may earn revenue, to be paid by TKFO to the Area Developer, in multiple ways, starting with the payment by TKFO to the Area Developer of 40 percent of the initial franchise fees paid to TKFO by each new franchisee upon its purchase of a franchise agreement for a Tilted Kilt restaurant/pub to be developed within the defined franchise territory.

17.     Under the AD Agreement, the Area Developer is also entitled to receive the payment by TKFO of 25 percent of any transfer fees collected by TKFO within 30 days of transfer closing, upon the sale of a franchise by one franchisee to another of a Tilted Kilt restaurant within the defined territory.

18.     In addition, under the AD Agreement the Area Developer is also entitled to receive the payment by TKFO of 33% of the royalty fees actually collected by TFKO from its franchisees within the defined territory over the life of each franchise agreement.

19.     The AD Agreement is structured to provide the Area Developer with the incentive to develop as many Tilted Kilt restaurants as possible within its territory, to the point of market saturation.

20.     The AD Agreement is further structured to incentivize both TKFO and the Area Developer to empower and encourage each franchisee to achieve the highest possible gross revenues in its operations over the term of each franchise agreement.  By granting to the Area Developer the right to receive a percentage of

royalties collected over the term of each franchise, the AD Agreement is structured to allow the Area Developer the opportunity to build a substantial revenue stream that will last for many years, thereby creating substantial equity value in the Area Developer Agreement to the Area Developer.

21.     Under the AD Agreement, however, TKFO reserves many rights under the franchise agreements that TKFO enters into with its franchisees that are not delegated to the Area Developer.  For example:

a.  1220 lacks contractual authority to approve a particular franchisee or a particular franchised location.

b.  1220 lacks contractual authority to enforce the terms of a franchise agreement against a non-complying franchisee. For example, if a franchisee stops paying royalties, or does not comply with system standards, or seeks to compete against the franchised brand in violation of in-term or post-termination restrictive covenants, the Area Developer cannot take any actions to protect the system or to protect its own interests in the revenue streams created by the AD Agreement

c.  1220 lacks contractual authority to implement any territory-wide marketing programs, advertising programs, media buys, or any other initiatives that might be desired to improve sales at the franchised restaurants/pubs within the territory.

d.  1220 lacks any contractual authority to hire a Franchise Business Consultant.

9

22. Each of the powers referenced in paragraph 21 are reserved to TKFO,

23. Under the Franchise Agreements TKFO enters into with the individual franchisees, TKFO is required to provide initial five week training to franchisees (called STEP training). Under these agreements, franchisees are required to have a General Manager and Kitchen Manager go through STEP training. TKFO has repeatedly failed to enforce the training requirements, resulting in Tilted Kilt restaurants with undertrained and underqualified operators. 1220 lacks contractual authority to enforce the training requirements, and is dependent on TKFO to enforce these requirements.

24. In all of the ways described above and without limitation, 1220 as an area developer is substantially dependent upon TKFO's good faith, commercially reasonable performance of its duties and exercise of its rights as the franchisor for its financial success as an area developer.

25. At all times relevant therein, 1220 has substantially complied with the material terms of its AD Agreement with TKFO. In particular, but without limitation, 1220 achieved the development schedule that the parties agreed to in executing the AD Agreement. In this respect, among others, 1220 has been one of the most successful area developers in the entire TKFO franchise system.

26. However, in multiple ways alleged below, TKFO has breached its duties to its franchisees under the franchise agreements, and has breached its duties to 1220 as an area developer, including both its express contractual duties

and its duties that are implied by law by the implied covenant of good faith and fair dealing.

27.    As the direct and proximate result of TKFO's breaches of contract, 1220 has been substantially damaged and these damages will continue for as long as TKFO is allowed to continue as the franchisor of the Tilted Kilt brand and franchise system.

## COUNT I

## BREACHES OF CONTRACT:

## Claim for Damages against TFKO

28.    Plaintiff incorporates paragraphs 1 through 27 of this Complaint as though fully set forth herein.

29.    Pursuant to the AD Agreement that TKFO executed with 1220, TKFO is subject as a matter of law to an implied covenant of good faith and fair dealing (the "implied covenant").  As a matter of law, the implied covenant emphasizes faithfulness by the parties to a contract to their agreed common purpose, and it protects the justified expectations of the other party.  In addition, and also as a matter of law, the implied covenant prohibits a party from engaging in conduct that may be characterized as involving "bad faith" because it violates community standards of decency, fairness, or reasonableness.  As a matter of law, bad faith that violates the implied covenant may include conduct that, by way of example but not limitation: is arbitrary and capricious; involves improper motives; evades the spirit of the bargain; lacks diligence; constitutes slacking off in performance or the willful

11

rendering of imperfect performance, or the abuse of a power to specify terms; or the interference with or failure to cooperate in the other party's performance.

30.    Without limitation, TKFO has breached its express and implied duties under the AD Agreement, and has thus damaged the Tilted Kilt franchise system and brand and caused injury to 1220, in multiple ways.  For example:

    a.  TKFO has made grossly unreasonable or bad-faith decisions as to the products, services, equipment and supplies that franchisees are required to purchase, resulting in the franchisees experiencing higher costs and receiving less value for their money.

    b.  TKFO has abused vendor rebates to the point where franchisees are placed at a severe competitive disadvantage, and has forbidden ADs, including 1220, from negotiating better vendor deals for franchisees. For example, without limitation, TKFO negotiated national vendor deals with numerous liquor vendors, including Anheuser-Busch, Miller Brewing Company, Brown Forman, and Jim Beam, which provided rebates to TKFO on the national level, while imposing unreasonable terms on its franchisees.

    c.  TKFO has failed to develop, implement, or enforce effective advertising programs at the national or local levels.  For example, without limitation:

        i.  In or about July 2015, TKFO cancelled the Local Advertising Marketing (LAG) program that had

previously been established in the greater Chicago market served by 1220, and likewise cancelled the LAGs in other markets across the country, weakening the brand and damaging sales.

ii. In conjunction with the cancellation of the LAG, TKFO failed to enforce the requirement in every franchise agreement that each franchisee is required to submit a marketing plan that shows they are spending 3 percent of their gross revenues on marketing.

iii. On information and belief, as of October 31, 2015, only 2 out of the 12 pubs in 1220's territory had presented a marketing plan to TKFO.

iv. TKFO has failed in its obligations to provide National Marketing Media Buy Plans. As of January 13, 2016, no 2016 Media Buy Plan has been presented to 1220, and the 2015 Media Buy Plan expenditures have not been accounted for.

d. TKFO has repeatedly ignored requests by 1220 and by franchisees in the Chicagoland market served by 1220 for greater assistance in marketing, advertising, and public relations. The lack of an effective coordinated local advertising program has had a dramatically negative effect on sales in the Chicago area pubs, resulting in declining royalty

income to 1220 and declining attractiveness of the Tilted Kilt franchising opportunity, meaning that fewer new pubs will likely be opened in the future.

e. TKFO has failed to develop and maintain an attractive menu that is necessary to achieve customer loyalty and has arbitrarily and capriciously rejected reasonable requests for local menu enhancements that would be likely to have attracted more customers to the restaurant/pubs in the Chicago area market.

f. TKFO has allowed various franchisees in 1220's territory to pay less than the full amount of royalties that are due under their respective franchise agreements. The effect of these royalty waivers has been to reduce the revenue to both TKFO and 1220, and the cumulative lost revenue to 1220 exceeded $360,000 as of the end of 2015. To the extent that TKFO deemed that it had no choice but to grant royalty relief to its franchisees, the primary and substantial reason that TKFO has found itself in that predicament is that the franchisees, in general, are aware that TKFO has grossly defaulted in its duties to manage this franchise system and are thus in revolt against their Franchisor.

g. TKFO has failed to enforce the contractual restrictive covenant obligations of certain franchisees in 1220's territory, (including the franchises located at Schaumburg, Chicago Ridge and Kenosha).

14

TKFO allowed these franchisees to open new competing businesses in direct violation of their restrictive covenants.

h. TKFO has not taken action to recover liquidated damages for any of the pubs that closed down prior to expiration of their franchise agreement term, including Elgin, Chicago Ridge, Vernon Hills, Kenosha, and Merrillville.

i. TKFO has repeatedly failed to enforce the contractual obligations (thus allowing willful non-compliance) of certain franchisees in 1220's territory with system standards for the appearance of their pubs and for the quality and selection of products sold at their pubs, including but not limited to the franchises located at Woodridge, Rockford, Roselle, Oakbrook Terrace, Schaumburg, Bolingbrook, Joliet, Aurora, and Skokie. 1220 has repeatedly informed TKFO that the pubs named in this paragraph are not in compliance, but TKFO has ignored these reports and refuses to take action to protect the brand.

31. In addition, as a further breach of contract, TKFO has schemed for years to find a way to terminate 1220 as an Area Developer, as TKFO has coveted for itself the revenue stream that 1220 is entitled to receive under its AD Agreement. In connection with this scheming, TKFO has undermined 1220's position as area developer by making it known in the Tilted Kilt franchise system that it desires to terminate 1220, thus undermining 1220's ability to perform as Area Developer.

32.     The effects of the acts and omissions by TKFO as alleged in paragraph 30 and 31 are cumulative. In all of the ways alleged in paragraphs 30 and 31, without limitation, TKFO has:  (1) breached its express and implied duties under the AD Agreement; (2) been arbitrary, capricious, and unreasonable in its business decisionmaking; (3) evaded the spirit of the bargain, lacked diligence, and defeated 1220's justifiable expectations; (4) slacked off, willfully rendered imperfect performance, and abused its power to specify terms; (5) acted with improper motives; and (6) interfered with or failed to cooperate in the other party's performance and interfered with 1220's performance.

33.     The cumulative effect of TKFO's conduct has been to substantially damage the goodwill associated with the Tilted Kilt trademarks, which TKFO has licensed to 1220 and to its franchisees.

34.     The cumulative effect of TKFO's conduct has been to substantially damage 1220, the other area developers, and all of the Tilted Kilt franchisees.

35.     The damages to 1220 include, without limitation, revenues that have already been lost, including:

a.  Specific lost royalty income to 1220 that TKFO has waived, in amounts that will be proven at trial, but which currently exceed $360,000.

b.  Past and continuing lost revenue and profits from restaurant/pubs that were forced (or allowed) to close down in amounts that will be proven at trial.

16

c. Past and continuing lost revenue and profits from additional restaurant/pubs that foreseeably would have been opened in the absence of TKFO's breaches in amounts that will be proven at trial.

d. Additional past and continuing lost revenues and profits that will be proven at trial;

e. Injury to reputation in amounts that will be proven at trial; and/or

f. Diminution of the value of the AD Agreement to 1220 and damage to the equity value of 1220 in amounts that will be proven at trial.

36. Unless the disastrous courses of action by TKFO are reversed, 1220 will likely suffer the complete loss of value of its AD Agreement with TKFO. The lost value to 1220, measured over the remaining years of its AD Agreement and the renewal period as the difference between what the AD Agreement would have been worth in the absence of TKFO's breaches of contract, and what it will actually be worth due to TKFO's breaches of contract, is presently estimated to exceed $22 million and will be proven at trial.

37. In addition to sustaining past, present, and future damages as alleged herein, 1220 is incurring substantial costs of suit including attorneys' fees that it seeks to recover from TKFO in this case.

## COUNT II

## CLAIM FOR APPOINTMENT OF RECEIVER

## OR OTHER INJUNCTIVE RELIEF

17

38.     Plaintiff incorporates paragraphs 1 through 37 of this Complaint as though fully set forth herein.

39.     TKFO, under its present management and ownership, is fully aware that as franchisor it is engaged in a purposeful course of action that will inevitably lead to the complete destruction of the Tilted Kilt brand and devastating financial losses for every franchisee and area developer in the system, including but not limited to 1220.

40.     TKFO, under its present management and ownership, is a company that is completely out of control and is no longer even trying to live up to its contractual duties, including the duty of good faith and fair dealing, that it owes to each and every one of its franchisee and area developers in the system, including but not limited to 1220.

41.     In sum, this case is extraordinary. The ongoing and purposeful dereliction of duty by this franchisor knows no bounds.  In the absence of drastic equitable relief, irreparable injury will be inflicted not only on 1220 but on every other franchisee and area developer in the system.

42.     The only remedy that would possibly protect the interests of 1220 under its AD Agreement would be the entry of an Order appointing a Receiver to take control over the Tilted Kilt franchise system, in place of TKFO.  The Receiver would necessarily be empowered to:

a. On an interim basis perform the duties of TKFO under its various franchise agreements and area development agreements;

b. On an interim basis collect the revenues that TKFO would have collected and apply those revenues to the improvement of the Tilted Kilt franchise system and/or pay the legitimate claims of area developers and franchisees.

c. Sell the rights of TKFO under all of its area developers and franchisees to qualified persons or entities, and apply the proceeds of such sale(s) to pay creditors including the claims of area developers and franchisees for damages and for costs of suit including reasonable attorneys' fees.

43.     In the alternative to the appointment of a receiver, the Court should enter such other injunctive relief that will adequately protect the rights of 1220.

44.     The public interest most strongly favors the granting of the relief requested in this count.

## **COUNT III**

## **VIOLATION OF THE ILLINOIS FRANCHISE DISCLOSURE ACT**

45.     Plaintiff incorporates paragraphs 1 through 44 of this Complaint as though fully restated herein.

46.     The relationship between Plaintiff and Defendant is that of a (sub) franchisee and franchisor.  As a matter of law, 1220 enjoys the protections extended to franchisees in Illinois by the Illinois Franchise Disclosure Act, 815 ILSC 705/1 *et seq*. ("IFDA").

47.     Under Section 19 of the IFDA, 815 ILSC 705/19, it is a violation of the Act for a franchisor to terminate a franchise in the State of Illinois prior to the

19

expiration of the franchise agreement, except for "good cause;" and under Section 19 of the IFDA, 815 ILSC 705/19, "good cause" is defined as a "failure of the franchisee to comply with any lawful provisions of the franchise or other agreement *and to cure such default after being given notice thereof and a reasonable opportunity to cure such default.*"

48.     In its complaint in this lawsuit TKFO is attempting to achieve the termination of 1220 without complying with its obligations under Section 19 of the IFDA as it is attempting to terminate without good cause, and without affording the statutory right to notice and the opportunity to cure any alleged defaults.

49.     As the direct and proximate result of Defendant's attempted unlawful termination, Plaintiff has sustained damages in amounts to be proven at trial. These damages include without limitation an injury to reputation and the need to incur attorneys' fees and costs in defense against the attempted termination.

50.     In addition to any other damages that may be proven at trial, 1220 is entitled to its recover its costs and attorneys' fees pursuant to 815 ILCS 705/26.

**PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays for the following relief from this Court:

a)      On Counts I and III of the Complaint, enter judgment in favor of Plaintiff against TKFO, and award actual and consequential damages to Plaintiff in amounts to be proven at trial;

20

b)      On Count II of the Complaint, for the appointment of a Receiver to

take control over the Tilted Kilt franchise system or such other

injunctive relief as may be appropriate;

c)      Award Plaintiff its costs and attorneys' fees;

d)      Award any other relief this Court deems just and appropriate.

January 19, 2016

Respectfully Submitted,

Plaintiff, 1220, LLC

By:  /s/ Carmen D. Caruso
            One of its Attorneys

Carmen D. Caruso (#6189462) – cdc@cdcaruso.com
Shane D. Valenzi (#6314178) – sdv@cdcaruso.com
Kristen Guralczyk (#6319211) – kmg@cdcaruso.com
Jackie Condella (#6320460) – jcc@cdcaruso.com

CARMEN D. CARUSO LAW FIRM
77 West Washington Street,
Suite 1900
Chicago, Illinois 60602
Phone:         312-626-1160
Facsimile:    312-276-8646

# EXHIBIT A

# 1220, LLC

# TILTED KILT FRANCHISE OPERATING, LLC

# AREA DEVELOPER AGREEMENT

**THE AREA DEVELOPER TERRITORY:**

**The following counties within the State of Illinois: Lake; McHenry; DeKalb; Kane; DuPage; Cook; Will; Kendall; Gundy; Kankakee; Boone; Winnebago; Stephenson; Jo Daviess; Carroll; Ogle; Whiteside; Lee; Bureau; Putnam; LaSalle; and Livingston; and Iroquois.**

**INCLUDING Lake, Porter, Newton, Jasper and LaPorte counties in the State of Indiana.**

**INCLUDING Kenosha county in the State of Wisconsin.**

_07-30-2007_

Date

**1220, LLC**
Area Developer
2225 East Oakton Street, Arlington Heights, IL 60005
Tele:(847)690-8071E-Mail: anthonyB@albsconstruction.com

**TILTED KILT FRANCHISE OPERATING, LLC**
**AREA DEVELOPER AGREEMENT**

**TABLE OF CONTENTS**

**Section Number**                                                                 **Page Number**

1.      BACKGROUND AND PURPOSE ............................................................................... 1

2.      DEFINITIONS ............................................................................................................. 1
        2.1.    Area Developer Area. ..................................................................................... 1
        2.2.    Sales and Development Period. ...................................................................... 1
        2.3.    Franchise Agreement. ..................................................................................... 2
        2.4.    Franchisee. ...................................................................................................... 2
        2.5.    Multi-Restaurant Development Agreement. ................................................... 2
        2.6.    Developer. ....................................................................................................... 2
        2.7.    AD Operations Manual. .................................................................................. 2
        2.8.    Affiliate. .......................................................................................................... 2

3.      SCOPE OF APPOINTMENT ...................................................................................... 3
        3.1.    Appointment of Area Developer/Scope of Operations. .................................. 3
        3.2.    Rights and Limitations to Area Developer Area. ........................................... 3
        3.3.    Business Office. .............................................................................................. 3
        3.4.    Franchisor's Reservation of Rights to Franchisor. ........................................ 3

4.      FRANCHISE SALES AND DEVELOPMENT PROCEDURES ................................ 4
        4.1.    Sales and Development Goals. ........................................................................ 4
        4.2.    Development by AD. ....................................................................................... 4
        4.3.    Franchise Registration and Disclosure. ......................................................... 4
        4.4.    Advertising, Recruiting and Screening ........................................................... 5
        4.5.    Franchisor's Approval of Prospective Franchisees......................................... 5

5.      PAYMENTS TO THE FRANCHISOR ....................................................................... 6
        5.1.    Initial Area Developer Fee............................................................................. 6

6.      PAYMENTS TO THE AREA DEVELOPER ............................................................. 6
        6.1.    Commissions on Sales and Development Services.......................................... 6
        6.2.    Commissions on Transfers of Franchises........................................................ 7
        6.3.    Commissions on Royalty Fees. ...................................................................... 7
        6.4.    Application of Payments.................................................................................. 7
        6.5.    Setoffs. ............................................................................................................ 8

7.      TRAINING ASSISTANCE.......................................................................................... 8
        7.1.    Area Developer Training. ................................................................................ 8
        7.2.    Length of Training........................................................................................... 8
        7.3.    Additional Training......................................................................................... 8
        7.4.    Seminars and Ongoing Training...................................................................... 8

8.      FRANCHISOR'S OPERATING ASSISTANCE......................................................... 9
        8.1.    AD Operations Manual.................................................................................... 9
        8.2.    Operating Assistance. ..................................................................................... 9

9.      AREA DEVELOPER'S OBLIGATIONS ................................................................. 10

|       | 9.1.   | Hiring and Training of Employees of Area Developer. | 10 |
|       | 9.2.   | Commencement of Business. | 10 |
|       | 9.3.   | Sales and Development Services. | 10 |
|       | 9.4.   | Pre-Opening Support Services. | 10 |
|       | 9.5.   | Ongoing Support Services. | 12 |
|       | 9.6.   | Compliance with Franchise Agreement. | 13 |
|       | 9.7.   | Area Developer's Inspections. | 13 |
|       | 9.8.   | Initial Advertising and Marketing Campaign; Marketing Plan. | 13 |
| 10.   | MARKS. | | 14 |
|       | 10.1.  | Ownership and Goodwill of Marks. | 14 |
|       | 10.2.  | Limitations on Use. | 14 |
|       | 10.3.  | Discontinuance of Use of Marks. | 14 |
|       | 10.4.  | Notification of Infringements and Claims. | 14 |
|       | 10.5.  | Indemnification. | 15 |
| 11.   | CONFIDENTIAL INFORMATION | | 15 |
|       | 11.1.  | Confidential Information. | 15 |
|       | 11.2.  | Nondisclosure and Noncompetition Agreement. | 15 |
| 12.   | EXCLUSIVE RELATIONSHIP | | 16 |
|       | 12.1.  | Exclusive Relationship. | 16 |
| 13.   | OPERATING STANDARDS | | 16 |
|       | 13.1.  | Standards of Service. | 16 |
|       | 13.2.  | Compliance with Laws and Good Business Practices. | 17 |
|       | 13.3.  | Accuracy of Information. | 17 |
|       | 13.4.  | Notification of Litigation. | 17 |
|       | 13.5.  | Ownership and Management of Business. | 17 |
|       | 13.6.  | Conflicting Interests. | 18 |
|       | 13.7.  | Insurance. | 18 |
|       | 13.8.  | Proof of Insurance Coverage. | 18 |
|       | 13.9.  | Advertising in Marketing Area. | 18 |
|       | 13.10. | Approval of Advertising. | 19 |
|       | 13.11. | Accounting, Bookkeeping and Records. | 19 |
|       | 13.12. | Reports. | 19 |
|       | 13.13. | Compliance with Third Party Agreements. | 19 |
|       | 13.14. | Late Charges. | 20 |
|       | 13.15. | Confidential Communications. | 20 |
|       | 13.16. | Electronic Advertising. | 20 |
| 14.   | INSPECTIONS AND AUDITS | | 20 |
|       | 14.1.  | Inspections and Audits. | 20 |
| 15.   | TRANSFERS | | 21 |
|       | 15.1.  | Transfers by the Franchisor. | 21 |
|       | 15.2.  | Transfers by Area Developer. | 21 |
|       | 15.3.  | Conditions for Approval of Transfer. | 21 |
|       | 15.4.  | Transfer to an Entity. | 22 |
|       | 15.5.  | Franchisor's Approval of Transfer. | 22 |
|       | 15.6.  | Death or Disability of Area Developer. | 22 |
|       | 15.7.  | Right of First Refusal. | 23 |

| | | | |
|---|---|---|---|
| 16. | | TERM AND EXPIRATION | 23 |
| | 16.1. | Term. | 23 |
| | 16.2. | Rights Upon Expiration. | 23 |
| | 16.3. | Exercise of Option for Successor Area Developer Rights. | 24 |
| | 16.4. | Conditions of Refusal. | 24 |
| | | | |
| 17. | | TERMINATION | 24 |
| | 17.1. | By Area Developer. | 24 |
| | 17.2. | By Franchisor. | 24 |
| | 17.3. | Rights and Obligations of the Area Developer Upon Termination or Expiration. | 25 |
| | 17.4. | Confidential Information. | 27 |
| | 17.5. | Covenant Not to Compete. | 27 |
| | 17.6. | No Further Right to Payment. | 27 |
| | 17.7. | Continuing Obligations. | 28 |
| | 17.8. | State and Federal Law. | 28 |
| | | | |
| 18. | | RELATIONSHIP OF THE PARTIES. | 28 |
| | 18.1. | Relationship of the Parties. | 28 |
| | 18.2. | Payment of Third Party Obligations. | 28 |
| | 18.3. | Independent Contractors. | 29 |
| | 18.4. | Indemnification. | 29 |
| | | | |
| 19. | | MEDIATION | 29 |
| | 19.1. | Mediation | 29 |
| | 19.2. | Governing Law/Consent to Venue and Jurisdiction/Waiver of Jury Trial. | 30 |
| | 19.3. | Injunctive Relief. | 31 |
| | | | |
| 20. | | MISCELLANEOUS PROVISIONS | 31 |
| | 20.1. | Invalidity. | 31 |
| | 20.2. | Modification. | 31 |
| | 20.3. | Attorneys' Fees. | 31 |
| | 20.4. | No Waiver. | 31 |
| | 20.5. | No Right to Set Off. | 32 |
| | 20.6. | Effective Date. | 32 |
| | 20.7. | Review of Agreement. | 32 |
| | 20.8. | Entire Agreement. | 32 |
| | 20.9. | Notices. | 32 |
| | 20.10. | Payment of Taxes. | 32 |
| | 20.11. | Cumulative Rights. | 33 |
| | 20.12. | Acknowledgment. | 33 |

## EXHIBITS

| | |
|---|---|
| Exhibit I - | Rider to Area Developer Agreement |
| Exhibit II - | Franchise Agreement |
| Exhibit III - | Multi-Restaurant Development Agreement |
| Exhibit IV - | Guaranty and Assumption of Area Developer's Obligations |
| Exhibit V - | Statement of Ownership |

## TILTED KILT FRANCHISE OPERATING, LLC
## AREA DEVELOPER AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this _30_ day of _July_, 2007, between **TILTED KILT FRANCHISE OPERATING, LLC**, a Wyoming limited liability company, with its principal offices at 1300 N. McClintock, E-14, Chandler, Arizona 85226 ("**Franchisor**") and 1220, LLC, whose principal address is 2225 East Oakton Street, Arlington Heights, IL 6005 ("**Area Developer**" or "**AD**"), who on the basis of the following understandings and in consideration of the following promises, agree as follows:

## 1.     BACKGROUND AND PURPOSE

**1.1.**     The Franchisor has developed methods for the establishment, operation and promotion of sports and entertainment bars and restaurants that offer dinner entrées, traditional pub food, hamburgers, salads, pizza and alcoholic beverages in a Celtic-themed atmosphere ("**TILTED KILT Restaurants**" or "**Restaurants**") and that use the service mark "TILTED KILT" and related logos, service marks, trade names, trademarks and commercial symbols ("**Marks**") and operate under the Franchisor's distinctive entertainment and business format, systems, methods, procedures, designs, layouts and specifications ("**Licensed Methods**").

**1.2.**     The Franchisor grants to qualified individuals, or to entities with which such individuals are affiliated, the right and license to develop and operate Restaurants using the Marks and Licensed Methods.

**1.3.**     The AD desires to act as an independent representative for the Franchisor within a certain geographic area, enabling the AD to operate a business ("**AD Business**" or "**Business**") that sells and develops franchises for TILTED KILT Restaurants and provides opening and operational support services to TILTED KILT Restaurants within such geographic area, under the terms and conditions which are contained in this Agreement.

**1.4.**     The Franchisor desires to grant the AD the right to serve as an area developer, enabling the AD to operate a business that sells and develops franchises for TILTED KILT Restaurants and that provides opening and operational support services to TILTED KILT Restaurants within a certain geographic area, under terms and conditions which are contained in this Agreement.

## 2.     DEFINITIONS

### 2.1.     Area Developer Area.

"**Area Developer Area**" or "**ADA**" shall mean the geographic area described in <u>Exhibit I</u> attached hereto and incorporated herein by reference.

### 2.2.     Sales and Development Period.

"**Sales and Development Period**" shall mean each period of time defined as a Sales and Development Period in the attached <u>Exhibit I</u>.

**2.3.**     **Franchise Agreement.**

"**Franchise Agreement**" shall mean the forms of agreements (including, without limitation, the franchise agreement and any addendums, riders, statements of ownership, payment authorization agreements and personal guarantees used in connection therewith) used by the Franchisor from time to time in the granting of franchises for the ownership and operation of TILTED KILT Restaurants. Attached to this Agreement as Exhibit II and incorporated herein by reference is the Franchisor's current form of Franchise Agreement.  The AD acknowledges that the AD will use the Franchisor's then current form of franchise agreement and that the Franchisor, in its sole discretion, may from time to time modify or amend in any respect the form of franchise agreement and related agreements, including but not limited to, modifying fees, customarily used in granting TILTED KILT Restaurant franchises.

**2.4.**     **Franchisee.**

"**Franchisee**" shall mean any person, corporation, partnership or other entity who has entered into a Franchise Agreement with the Franchisor.

**2.5.**     **Multi-Restaurant Development Agreement.**

"**Multi-Restaurant Development Agreement**" or "**MRD Agreement**" shall mean the forms of agreements (including, without limitation, the Multi-Restaurant Development Agreement and any exhibits, riders, addendums and Franchise Agreements used in connection therewith) used by the Franchisor from time to time in the granting of development rights for a specified number of TILTED KILT Restaurants in a certain geographic area during a specified period of time.  Attached to this Agreement as Exhibit III and incorporated herein by reference is the Franchisor's current form of Multi-Restaurant Development Agreement.  AD acknowledges that AD will use the Franchisor's then current form of Multi-Restaurant Development Agreement and that the Franchisor, in its sole discretion, may from time to time modify or amend in any respect the form of multi-restaurant development agreement and related agreements, including but not limited to, modifying fees, customarily used in granting development rights for TILTED KILT Restaurants.

**2.6.**     **Developer.**

"**Developer**" shall mean any person, corporation, partnership or other entity who has entered into a MRD Agreement with the Franchisor.  Developers are required to sign Franchise Agreements for every Restaurant they develop.

**2.7.**     **AD Operations Manual.**

"**AD Operations Manual**" means the manuals, technical bulletins or other written, electronic, audio or videotaped materials covering the proper operating and marketing techniques of an AD Business and standards and specifications for implementing the Licensed Methods.

**2.8.**     **Affiliate.**

"**Affiliate**" shall mean an individual or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with another entity or individual. For purposes of this definition, "**control**" shall mean owning 51% or more of the ownership interests in the subject entity.

## 3.    SCOPE OF APPOINTMENT

### 3.1.    Appointment of Area Developer/Scope of Operations.

The Franchisor appoints the AD, and the AD accepts the appointment and agrees to perform its obligations as an independent representative of the Franchisor in accordance with the terms and conditions of this Agreement, and only within the Area Developer Area, to develop Restaurants, itself or by soliciting and referring to Franchisor prospective Franchisees who may qualify to operate TILTED KILT Restaurants to be located in the Area Developer Area ("**Sales and Development Services**") as described in Section 9.3 below, and to perform certain site acquisition services and opening and operational support and other services ("**Support Services**") to Restaurants located in the ADA as those services are described in Sections 9.4 and 9.5 below.
how

### 3.2.    Rights and Limitations to Area Developer Area.

The Franchisor will not establish or license any other area developers to act as independent representatives to perform Sales and Development Services or to thereafter render Support Services to Franchisees in the ADA; provided, however, that the Franchisor shall retain such rights in the ADA as described in Section 3.4 below.

### 3.3.    Business Office.

The AD agrees to select and propose to the Franchisor for the Franchisor's prior approval and to maintain at all times during the term of this Agreement suitable office facilities in the ADA for operation of the AD Business ("**Business Office**"). The Business Office shall have a telephone line dedicated to the AD Business, high speed internet access and shall otherwise be equipped and furnished in a manner consistent with the image and minimum standards of the Franchisor.

### 3.4.    Franchisor's Reservation of Rights to Franchisor.

The AD acknowledges that the franchise granted hereunder is nonexclusive and that the Franchisor and its Affiliates retain the rights, among others:

a.    to use, and to license others to use, the Marks and Licensed Methods for the operation of AD Businesses at any location other than in the ADA;

b.    to use the Marks and Licensed Methods to solicit prospective Franchisees and to grant other persons franchises to operate TILTED KILT Restaurants, under both Franchise Agreements and MRD Agreements, at such locations within and outside of the ADA on such terms and conditions as the Franchisor deems appropriate (subject to the AD's right to receive a portion of the initial franchise fees and commissions for services rendered to such Restaurants as set forth in Article 6 of this Agreement);

c.    to itself or through its Affiliates own and operate TILTED KILT Restaurants within and outside of the ADA. However, Franchisor shall confer with AD before selling a franchise or putting a corporate affiliated store in the ADA;

d.    to use the Marks and Licensed Methods to identify services and products, promotional and development efforts and related items which may be similar to those which Franchisees or Area Developers will sell, but made available through alternative channels of distribution other than through TILTED KILT Restaurants, at any location; and

3

e.     to use and license the use of different proprietary marks in connection with: (i) the sale of franchises; or (ii) products and services similar to those which our Franchisees sell, whether in alternative channels of distribution or through restaurants which are the same as, or similar to, or different from TILTED KILT Restaurants, at any location, on any terms and conditions the Franchisor deems advisable.

## 4.     FRANCHISE SALES AND DEVELOPMENT PROCEDURES

### 4.1.     Sales and Development Goals.

The AD agrees that during the term of this Agreement, the AD will meet and maintain within the Area Developer Area the franchise sales and development goals ("**Sales and Development Goals**") set forth in Exhibit I to this Agreement.

### 4.2.     Development by AD.

The AD or its Affiliates shall have the right to open and operate Restaurants in the ADA. Every Restaurant developed by the AD shall be governed by a separate Franchise Agreement executed by the AD as a Franchisee thereunder or by an Affiliate qualified and approved by Franchisor to be a Franchisee. The AD or its Affiliates shall comply with the Franchise Agreement, including payment of all fees to the Franchisor. Subject to compliance with the terms and conditions of this Agreement, the AD will be entitled to the payments described in Article 6 of this Agreement.

### 4.3.     Franchise Registration and Disclosure.

The AD's Sales and Development Services, to the extent not fulfilled by the AD developing and operating its own Restaurants, shall consist of initially identifying and referring to the Franchisor such prospective Franchisees who may qualify to operate TILTED KILT Restaurants to be located in the ADA. Neither the AD nor any employee or representative of the AD shall solicit prospective Franchisees of TILTED KILT Restaurants until the Franchisor has registered in the applicable jurisdiction and has provided the AD with the requisite documents, including the Uniform Franchise Offering Circular or like disclosure document, or at any time when the Franchisor notifies the AD that its registration is not then in effect or its documents are not then in compliance with applicable law. If the AD's activities pursuant to this Agreement require the preparation, amendment, registration or filing of information or any disclosure or other documents containing information regarding AD, all requisite offering circulars, ancillary documents and franchise registration applications and registrations of AD as a franchise broker shall be prepared and filed by the Franchisor or its designee, and registration secured before the AD may solicit prospective Franchisees of TILTED KILT Restaurants. Costs of such registration applicable to the AD shall be borne by the AD. In particular, the AD shall:

a.     prepare and forward to the Franchisor verified financial statements of the AD in such form and for such periods as shall be designated by the Franchisor, including audited financial statements if necessary and appropriate to comply with applicable legal disclosure, filing or other legal requirements;

b.     promptly provide all information reasonably required by the Franchisor to prepare all requisite offering circulars and ancillary documents for the offering of franchises throughout the ADA;

c.      execute all documents required by the Franchisor for the purpose of registering the AD and the Franchisor to offer franchises throughout the ADA; and

d.      pay to the Franchisor, or its designee, upon demand, the costs of registering and preparing those portions of all such offering circulars and ancillary documents which are applicable to the AD.

The AD agrees to review all information pertaining to the AD to comply with legal requirements for selling franchises in the ADA and verify its accuracy if so requested by the Franchisor. The AD acknowledges that the Franchisor, its affiliates or its designees, shall not be liable to the AD for any errors, omissions or delays which may occur in the preparation of such materials.

**4.4.    Advertising, Recruiting and Screening.**

The AD shall be responsible for advertising, recruiting, screening and interviewing prospects for TILTED KILT Restaurant franchises within the ADA. The AD shall provide prospective Franchisees with written information regarding a TILTED KILT Restaurant franchise prepared and approved by the Franchisor, or via the telephone, face-to-face meetings or by visiting other TILTED KILT Restaurants within the ADA. The AD shall submit each qualified applicant (**"Applicant"**) for a TILTED KILT Restaurant franchise to the Franchisor for approval. The AD shall coordinate and schedule personal interviews of the Applicants with the Franchisor. The AD further agrees that all Applicants submitted to the Franchisor by the AD, if an individual, or the Principal Manager of the Applicant, if the Applicant is not an individual, shall be individuals who are of good character, have adequate financial resources and meet the Franchisor's criteria for Franchisees or Principal Managers of Franchisees. A **"Principal Manager"** is defined in Section 7.1 below. Each application for a franchise received by the AD shall be submitted to the Franchisor with all information respecting the Applicant, the Principal Manager of the Applicant, if applicable, the Applicant's proposed franchise location, if known, and all other information then customarily required by the Franchisor concerning Applicants, including such financial statements and other information as the Franchisor may reasonably require. The AD shall assist the Applicant in the preparation of reports and compiling of other information for submission to the Franchisor.

**4.5.    Franchisor's Approval of Prospective Franchisees.**

By delivery of written notice to the AD, the Franchisor shall approve or disapprove Applicants to become TILTED KILT Restaurant Franchisees and, if applicable, Developers. The Franchisor agrees to exert commercially reasonable efforts to deliver such notification to the AD within 15 days after the later of: (a) receipt by the Franchisor of a complete application, financial statement and other materials requested by the Franchisor; or (b) the personal interview of Applicant by the Franchisor. If the Franchisor, in its sole discretion, determines that the Applicant possesses sufficient financial and managerial capability and meets the other criteria then utilized by the Franchisor in the grant of franchises, the Franchisor shall offer to the Applicant a franchise for the operation of a TILTED KILT Restaurant and, if applicable, rights to develop more than one TILTED KILT Restaurant in a specific geographic area under the terms of a Multi-Restaurant Development Agreement. The grant of the franchise and, if applicable, development rights, shall be effected only upon and after the full execution of the then current Franchise Agreement and, if applicable, the then current Multi-Restaurant Development Agreement, by the Franchisor and the Applicant. Approval of a franchise applicant submitted by AD shall not be unreasonably withheld by Franchisor.

## 5. PAYMENTS TO THE FRANCHISOR

### 5.1. Initial Area Developer Fee.

The initial area developer fee ("**Initial Area Developer Fee**") payable to the Franchisor by the AD in consideration for the AD's appointment as exclusive AD within the ADA shall be calculated and set forth in the attached Exhibit I. Unless otherwise agreed, the Initial Area Developer Fee is payable in full within five (5) days after execution by both parties of this document. The Initial Area Developer Fee is fully earned by the Franchisor upon receipt and is nonrefundable once paid. The AD acknowledges that the Initial Area Developer Fee does not include payment of any initial franchise fees for individual TILTED KILT Restaurants.

## 6. PAYMENTS TO THE AREA DEVELOPER

### 6.1. Commissions on Sales and Development Services.

During the term of this Agreement, the AD shall be entitled to payment of a commission based on a percentage of initial franchise fees paid by Franchisees (including when the AD is a Franchisee) for the purchase of a franchise for a TILTED KILT Restaurant to be located within the Area Developer Area, upon fulfillment of the following conditions ("**Franchise Sales Conditions**"):

 a. The Franchisee (whether it is the AD or a third party Franchisee) shall have executed a Franchise Agreement with the Franchisor and an initial franchise fee shall have been paid and actually received by the Franchisor (the Franchisor shall not be deemed to have received any fees paid into escrow, if applicable, until such fees have actually been remitted to the Franchisor);

 b. The sale for which the initial franchise fee has been paid is not a resale of any existing TILTED KILT Restaurant, or any interest therein;

 c. The Franchisee shall have successfully completed the Franchisor's initial training program;

 d. The TILTED KILT Restaurant shall have opened for business;

 e. The AD has complied with all other of its obligations under this Agreement with respect to such sale and has verified the same to the Franchisor, in writing in a form prescribed by the Franchisor.

 f. Franchisor will waive one (1) franchise fee for 1220, LLC, which has committed to opening a franchise restaurant on behalf of Baroud Development Group LLC or nominee.

Subject to the above described Franchise Sales Conditions being fulfilled, commissions on Sales and Development Services shall be paid to the AD in the total amount of 40% of the total initial franchise fees paid by Franchisees in the ADA to the Franchisor. Earned commissions on Sales and Development Services shall be payable to the AD within 30 days after the date the Restaurant opens for business.

**6.2.    Commissions on Transfers of Franchises.**

If, during the term of this Agreement, a TILTED KILT Restaurant located within the Area Developer Area or an interest therein is resold to a different Franchisee and the sale results in the execution of a Franchise Agreement and the payment of a transfer fee, then, subject to fulfillment by the AD of the ongoing support services relating to transfer set forth in Section 9.5. below, the Franchisor shall pay to the AD, within 30 days after receipt of payment of any transfer fee, 25% of the transfer fee received by the Franchisor from the transfer of Restaurants located in the ADA.

**6.3.    Commissions on Royalty Fees.**

Subject to Section 6.4 below, the Franchisor shall pay to the AD, within 14 days of the end of each month, 33% of the amount of royalty fees (which excludes advertising fees) which each third party Franchisee (not including where the AD or its Affiliate is the Franchisee) located in the ADA paid to the Franchisor during the applicable month pursuant to their Franchise Agreement (**"Royalty Fees"**). Notwithstanding the foregoing:

a.    If the AD has failed to conduct the periodic inspections described in Section 9.5 below and file a written report or failed to perform in any material respect the other services to be provided to Franchisees located in the Area Developer Area described in Article 9 below during any applicable period with respect to one or more Franchisees located in the Area Developer Area, the AD shall not be entitled to receive commissions on Royalty Fees with respect to such Franchisees for the period during which reports or services were not provided.

b.    The AD shall not be entitled to share in or receive any commissions on Royalty Fees from any fees paid to the Franchisor by Franchisees in the Area Developer Area prior to the time AD completes the initial AD training program and commences full performance of the services set forth in Article 9 of this Agreement.

**6.4.    Application of Payments.**

The Franchisor's payments to the AD shall be based on amounts actually collected from Franchisees, not on payments accrued, due or owing.  In the event of termination of a Franchise Agreement for a TILTED KILT Restaurant within the Area Developer Area under circumstances entitling the Franchisee to the return of some Royalty Fees (or in the event that the Franchisor becomes legally obligated or decides in its sole discretion, to return some Royalty Fees), the Franchisor may deduct the portion of the amount to be returned to Franchisee in the same proportion as the AD shared in the Royalty Fees from any future amounts owed the AD. The Franchisor shall apply any payments received from a Franchisee to any past due indebtedness of that Franchisee for Royalty Fees, advertising contributions, purchases from the Franchisor or its affiliates, interest or any other indebtedness of that Franchisee to the Franchisor or its affiliates. To the extent that such payments are applied to a Franchisee's overdue Royalty Fee payments, the AD shall be entitled to its pro rata share of such payments, less its pro rata share of the costs of collection paid to third parties.

**6.5.** **Setoffs.**

The AD shall be allowed to set off amounts owed to the Franchisor for fees or other amounts due hereunder, against any monies owed to the AD by the Franchisor. The Franchisor shall be allowed to set off amounts owed to the AD for commissions, commissions on Royalty Fees or other amounts due hereunder, against any monies owed to the Franchisor by the AD or its Affiliates. The AD's and the Franchisor's right to setoff shall continue in full force and effect, subsequent to and notwithstanding the expiration or termination of this Agreement.

## 7. TRAINING ASSISTANCE

**7.1.** **Area Developer Training.**

The Franchisor shall furnish, and the AD (or if the AD is a partnership, corporation, or other entity, an individual designated by the AD who has been approved by the Franchisor, who shall be designated as the **"Principal Manager"**) shall attend, at the AD's sole cost and expense, an initial training program, to consist of portions of the training program applicable to the Franchisor's Franchisees, and such further training which may include topics such as marketing, franchise sales, franchise law compliance, site selection and Restaurant opening, as the Franchisor in its sole discretion deems advisable, furnished at such place and time as the Franchisor may designate. In order to complete AD training, an AD representative or one member of the AD team shall also attend and participate, at the AD's cost, in two Restaurant openings designated by the Franchisor, at or around the time the AD commences operation of the AD Business.

**7.2.** **Length of Training.**

The first part of the initial AD training program will consist of designated portions of the initial training program applicable to the Franchisor's Franchisees. The second portion of initial AD training program consists of five to eight days of instruction. The third portion of the initial AD training program consists of participation in two Restaurant openings. The AD shall be responsible for all travel and living expenses which are incurred in connection with attendance at all portions of the AD initial training program.

**7.3.** **Additional Training.**

The initial training program will be made available to replacement or additional Principal Managers and other management personnel during the term of this Agreement. The Franchisor reserves the right to charge a tuition or fee payable in advance, in an amount commensurate with the then current published prices of the Franchisor for such training. The AD will be responsible for all travel and living expenses incurred by its personnel in connection with attendance at the training program. Further, the availability of the training programs will be subject to space considerations and prior commitments to new TILTED KILT Franchisees and ADs.

**7.4.** **Seminars and Ongoing Training.**

From time to time, the Franchisor may present seminars, conventions or continuing development programs for the benefit of the AD or for the benefit of Franchisees located in the ADA. Franchisor may require an AD representative to attend one (1), but no more than one (1), mandatory seminar, meeting, conference, industry convention or program each calendar quarter. AD shall not be required to pay an attendance fee for such training event. The Franchisor shall give the AD at least 30 days prior written

notice of any seminar, meeting, conference, convention or program which is deemed mandatory. The Franchisor will not require that the AD or its Principal Manager attend any ongoing training more often than two times per calendar year and any national convention more than once per calendar year. The AD will be responsible for all travel and living expenses which are associated with attendance at any ongoing training program.

## 8. FRANCHISOR'S OPERATING ASSISTANCE

**8.1.** **AD Operations Manual.**

The Franchisor shall, in addition to the AD training program, loan to the AD during the term hereof one copy of its AD Operations Manual to assist the AD and its employees in the conduct of the business contemplated by this Agreement. The Franchisor may prescribe mandatory and suggested standards and operating procedures for the AD in the AD Operations Manual, which may be modified from time to time by the Franchisor. The AD shall keep its copy of the AD Operations Manual current. In the event of a dispute relating to the AD Operations Manual, the master copy that the Franchisor maintains at its principal office shall be controlling. The AD may not at any time copy any part of the AD Operations Manual, unless approved in writing by the Franchisor. In the event the AD's copy of the AD Operations Manual is lost, destroyed or damaged, the AD shall be obligated to obtain from the Franchisor, at the Franchisor's then applicable charge, a replacement copy of the AD Operations Manual. The AD Operations Manual and other writings communicated to the AD shall constitute material provisions of this Agreement as if fully set forth herein. The AD acknowledges that on the date of this Agreement, the AD Operations Manual is not yet complete.

**8.2.** **Operating Assistance.**

The Franchisor will make available the following services during the term of this Agreement:

a. Upon the reasonable request of the AD, consultation by telephone, facsimile or electronic mail regarding franchise sales, Franchisee support and assistance or other issues concerning the continued operation and management of your AD Business; and

b. Access to franchise sales advertising and promotional materials as may be developed by the Franchisor from time to time, the cost of which may be passed on to the AD. However, AD shall not be required to purchase advertising or promotional material from Franchisor.

## 9.    AREA DEVELOPER'S OBLIGATIONS

### 9.1.    Hiring and Training of Employees of Area Developer.

The AD shall hire all of the AD's employees, shall be exclusively responsible for the terms of their employment and compensation and shall implement a training program for employees to enable their compliance with the Franchisor's requirements; provided that the AD shall not employ any person whom the Franchisor, in its sole discretion, has determined to be unfit to represent the Franchisor in the marketing of TILTED KILT Restaurant franchises or in furnishing services to Franchisees. However, Franchisor shall not unreasonably without acceptance of persons that AD may consider for employment. The Franchisor reserves the right to require that the AD's employees attend, at the AD's cost, any training, program or seminar developed by the Franchisor, to certify the sales or service employees of the AD prior to such employees providing Sales and Development Services or Support Services. In the event the Franchisor develop "sales kits" to assist the AD in the training of employees, the Franchisee shall utilize and pay the Franchisor a reasonable amount for such "sales kits".

### 9.2.    Commencement of Business.

Unless otherwise agreed to in writing by the Franchisor and the AD, the AD has 120 days from the date of this Agreement within which to complete the initial training and commence operation of its AD Business. The Franchisor will extend the time within which the AD has to commence operations for a reasonable period of time, in the event that factors beyond the AD's reasonable control prevent the AD from meeting this development schedule, so long as the AD has made reasonable and continuing efforts to comply and the AD requests in writing, an extension of time in which to have its Business established before the 120 day period lapses. The obligations of the AD, including Sales and Development Services, shall commence at the later of: (a) the date the AD or its Principal Manager has satisfactorily completed the first portion of the Franchisor's initial training program; or (b) 120 days from the date of this Agreement.

### 9.3.    Sales and Development Services.

The AD shall develop TILTED KILT Restaurants in the Area Developer Area and open such Restaurants in accordance with the Sales and Development Goals, itself or through identifying and referring to Franchisor such prospective Franchisees who may qualify to develop TILTED KILT Restaurants to be located within the Area Developer Area. All Sales and Development Services shall be conducted in accordance with the procedures described in Article 4 above.

### 9.4.    Pre-Opening Support Services.

The AD shall perform the following pre-opening Support Services on behalf of the Franchisor with respect to Franchisees of TILTED KILT Restaurants located in the Area Developer Area:

a.    Provide advice to the Franchisee regarding the standards and specifications for the equipment, supplies and materials used in, and the menu items offered for sale by, the Restaurant and specifications regarding the selection of suppliers for the purchasing of items used in connection with the TILTED KILT Restaurant;

b.    Provide a total of 120 hours of initial training and consulting services at least five days prior to opening day and on-site assistance beginning the day each TILTED KILT Restaurant located in the ADA opens for business; provided, however, that: the assistance described in this Section 9.4.b. shall be provided by the AD personally or one of the AD's

employees who have successfully completed the AD initial training program). The Franchisor may provide additional personnel, as determined in the Franchisor's sole discretion, to assist the AD with the assistance described in this Section 9.4.b. for the first two Restaurants that are opened by Franchisees of TILTED KILT Restaurants in the ADA during the term of this Agreement. If the AD requests and the Franchisor agrees to provide additional assistance in connection with the provision of the initial training and consulting services described in this Section 9.4.b., the Franchisor reserves the right to charge the AD for all travel, lodging, living expenses and other identifiable expenses associated with such assistance, plus a fee based on the time spent by each representative of the Franchisor on behalf of the AD, which fee will be charged in accordance with the then current daily or hourly rates being charged by the Franchisor for assistance;

c.       Assist with Restaurant location selection for each Franchisee, which shall consist of providing each Franchisee with criteria for a satisfactory site and assisting each Franchisee in completing a site submittal package (containing such demographic, commercial and other information as the Franchisor may reasonably require) for each location at which the Franchisee proposes to establish and operate a TILTED KILT Restaurant;

d.       Assist with coordinating each Franchisee with the Franchisor's designated draftsman or architect to plan the as built survey, build out, interior design, layout, floor plan, signs, designs, color and decor of the Restaurant pursuant to the Franchisor's standards and specifications as prescribed from time to time;

e.       Provide advice to Franchisee regarding the permitting, bidding and construction processes;

f.       Provide information about required, recommended or acceptable terms and conditions to be included in the Franchisee's lease for the Restaurant premises. AD may require that each franchise restaurant lease allow AD the right to assume the lease in the event of default of the lease by franchisee. Although Franchisor requires that it also has the right to assume the lease in the event of default of the lease by franchisee, AD shall have first right of refusal to assume lease. AD shall exercise it right to assume the lease not less than ten (10) days before the termination of Franchisor's right to assume the franchisee's restaurant lease. If AD does not exercise its right to assume the lease before ten (10) days before Franchisor's right to assume the lease, then AD's right to assume the lease shall be considered waived;

g.       Provide guidance in implementing grand opening advertising and marketing programs, operating and sales procedures and bookkeeping and accounting programs;

h.       Provide assistance to each Franchisee in the ADA for the purpose of coordinating the initial training for each Franchisee as required in the Franchise Agreement;

i.       Conduct on-site inspections of each TILTED KILT Restaurant in the ADA during the construction process and upon completion of construction to ensure that the Restaurant complies with the Franchisor's architectural standards and specifications, said inspections to be verified by  and complete and submit to the Franchisor inspection reports required by the Franchisor; and

j.       Submit completed forms and reports to the Franchisor as prescribed by the Franchisor from time to time.

**9.5.    Ongoing Support Services.**

With respect to Franchisees of TILTED KILT Restaurants located in the ADA, the AD shall perform the following ongoing Support Services on behalf of the Franchisor:

a.    Upon the reasonable request of the Franchisee, provide consultation by telephone, facsimile or electronic mail regarding the continuing operation and management of the Restaurant and advice regarding Restaurant products and services, product quality control, menu items and customer relations issues;

b.    Provide on-going updates of information and programs regarding menu items and their preparation, the restaurant business generally and related Licensed Methods, including without limitation, information about special or new services of the Franchisor;

c.    Provide advice and assistance to the Franchisee in connection with the development of and improvements to the Franchisee's Restaurant;

d.    Conduct on-site inspections of each TILTED KILT Restaurant in the ADA at the frequency and in the manner as required by the Franchisor from time to time, said inspections to be verified by written reports;

e.    Provide access to advertising and promotional materials as may be developed by the Franchisor from time to time, assist Franchisees in implementing their own local advertising and promotional campaigns;

f.    At the Franchisor's written request, establish an advertising cooperative for all TILTED KILT Restaurants located in the ADA using forms and procedures supplied by the Franchisor;

g.    Submit quarterly reports to the Franchisor on activities in the ADA, using procedures and forms prescribed and supplied by the Franchisor;

h.    Use best efforts to cause the Franchisees in the ADA to timely pay all amounts due to the Franchisor and collect past due amounts from Franchisees;

i.    Use best efforts to assist the Franchisor with the collection of any and all reports that the Franchisees in the ADA are required to submit pursuant to the Franchise Agreement;

j.    Conduct at least one personal consultation per quarter with each Franchisee in the ADA regarding the continuing operation and management of the Restaurant and advice regarding services offered and related issues;

k.    . Assist the Franchisor in administering the transfer process in the event Franchisees in the ADA propose to transfer any interest in a Franchise Agreement, interest in the Franchisee entity or assets of a Restaurant located in the ADA; and

l.    Assist the Franchisor in approving and supervising Franchisee remodeling and upgrading of the real and personal property and equipment used in the operation of Restaurants located in the ADA.

**9.6.    Compliance with Franchise Agreement.**

        AD acknowledges that it is being delegated certain responsibilities of the Franchisor under the Franchise Agreement to Franchisees in the ADA. The responsibilities to Franchisees are to be performed by the AD as described herein or as may in the future be set forth in the AD Operations Manual or other reasonable standards and specifications as may be provided by the Franchisor from time to time, and the responsibilities to Franchisees will not materially change during the term of this Agreement[?]. In the performance of services to Franchisees of TILTED KILT Restaurants located in the ADA, the AD shall in all respects comply with the terms and conditions of any Franchise Agreement, Multi-Restaurant Development Agreement and other agreements in effect between the Franchisee and the Franchisor. The AD understands, however, that its rights as an area developer are only by virtue of this Agreement and that it is not in any manner a party, third party beneficiary or holder of any other right, title or interest in or to any Franchise Agreement or Multi-Restaurant Development Agreement, except for the Franchise Agreement(s) and Multi-Restaurant Development Agreement, if applicable, to which the AD is a party.

**9.7.    Area Developer's Inspections.**

        The AD shall ascertain through field audits, reviews and inspections, that each Franchisee in the Area Developer Area has complied satisfactorily with all of the terms and conditions of the Franchise Agreement, specifications, standards, operating procedures, and the Franchisee Operations Manual, and shall promptly notify the Franchisee in writing, with a copy and evaluation report to the Franchisor, of any deficiencies; provided, however, the AD understands and acknowledges that its inspections and reports are advisory only and that the Franchisor shall have: (a) all of the rights to inspect and ascertain compliance of all Franchisees as if this Agreement were not in effect; (b) the sole right to send notices of default to the Franchisee; (c) the sole right to terminate a Franchise Agreement or Multi-Restaurant Development Agreement for failure to cure such defaults (if an opportunity to cure is granted); and (d) the sole right to take any legal action with respect to any default or any violation of a Franchise Agreement or Multi-Restaurant Development Agreement. If the AD believes that any Franchisee in the ADA has breached a Franchise Agreement or Multi-Restaurant Development Agreement with the Franchisor, the AD shall document in writing all facts related to the alleged breach and shall request in writing that the Franchisor investigate such alleged breach. If, as a result of the Franchisor's investigation, the Franchisor determines that there is a breach by the Franchisee of its Franchise Agreement or Multi-Restaurant Development Agreement with the Franchisor, the Franchisor shall, in its sole discretion, take such action as it deems appropriate.

**9.8.    Initial Advertising and Marketing Campaign; Marketing Plan.**

        At or around the time of commencement of the AD Business, the AD shall conduct in the Area Development Area an initial advertising and marketing campaign for the sale of franchises. The Franchisor and the AD shall agree upon and designate in Exhibit I to this Agreement the minimum AD expenditure for such initial advertising and marketing campaign. The Franchisor shall assist the AD in determining the timing and content, and type of media package used, for the initial franchise sales and marketing campaign in the ADA. The AD is required to develop and obtain the written approval of the Franchisor, prior to the commencement of operations of the Business, of a franchise sales marketing plan. The Franchisor shall assist the AD in developing the franchise sales marketing plan for the Business by reviewing and approving prior to use the plan submitted by the AD.

## 10. MARKS

### 10.1. Ownership and Goodwill of Marks.

The AD acknowledges that its rights to use the Marks are derived solely from this Agreement and from the Franchise Agreement(s) which the AD or its Affiliate(s) have signed, unless such rights are granted under a separate written agreement with the Franchisor, and are limited to operating as a Franchisee under its Franchise Agreement(s) and as an AD pursuant to and in compliance with this Agreement. Any unauthorized use of the Marks by the AD shall constitute a breach hereof and of the AD's and its affiliates' Franchise Agreement(s) and an infringement of the Franchisor's rights in and to the Marks. The AD acknowledges and agrees that its usage of the Marks and any goodwill established thereby shall inure to the Franchisor's exclusive benefit and that neither this Agreement nor the AD's Franchise Agreement(s) confer any goodwill or other interests in the Marks upon the AD.

### 10.2. Limitations on Use.

The AD shall not use any Mark as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to the AD hereunder), or in any modified form, nor may the AD use any Mark in connection with unauthorized services or products or in any other manner not expressly authorized in writing by the Franchisor. The AD agrees to give such notices of trademark and service mark registration as the Franchisor specifies and to use and obtain such fictitious or assumed name registrations as may be required by the Franchisor or under applicable law. The AD further agrees that no service mark other than "TILTED KILT" or such other Marks as may be specified by the Franchisor shall be used in the marketing, promotion or operation of the AD's Business. Except as may be permitted in the AD Operations Manual, the AD agrees not to use any of the Marks as part of an electronic mail address or on any sites on the Internet or on the World Wide Web and the AD agrees not to use or register any of the Marks as a domain name on the Internet.

### 10.3. Discontinuance of Use of Marks.

If it becomes advisable at any time in the Franchisor's sole discretion for the Franchisor and/or the AD to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks or service marks, the AD, at its expense, agrees to comply with the Franchisor's directions to do so within a reasonable time after notice thereof.

### 10.4. Notification of Infringements and Claims.

The AD shall immediately notify the Franchisor of any apparent infringement of or challenge to the AD's use of any Mark, or claim by any person of any rights in any Mark, and the AD shall not communicate with any person other than the Franchisor or its counsel in connection with any such matter. The AD may not settle any claim without the Franchisor's written consent. The Franchisor shall have sole discretion to take such action as it deems appropriate and the right to control exclusively any litigation, U.S. Patent and Trademark Office proceeding or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark. The AD agrees to execute any and all instruments and documents, render such assistance and perform such acts as, in the opinion of the Franchisor's counsel, may be necessary or advisable to protect and maintain the Franchisor's interests in the Marks.

**10.5.    Indemnification.**

The Franchisor agrees to indemnify the AD against and to reimburse the AD for all damages for which the AD is held liable in any proceeding arising out of its authorized use of any Mark pursuant to and in compliance with this Agreement and the AD Operations Manual, provided that the AD has timely notified the Franchisor of such claim or proceeding and has otherwise complied with this Agreement and the AD Operations Manual.  The Franchisor, at its option, shall be entitled to defend and control the defense of any proceeding arising out of the AD's use of any Mark pursuant to and in compliance with this Agreement.

## 11.    CONFIDENTIAL INFORMATION

**11.1.    Confidential Information.**

The Franchisor possesses certain proprietary confidential information consisting of the methods, techniques, formats, specifications, procedures, information, systems, methods of business management, sales and promotion techniques and knowledge of and experience in the operation and franchising of TILTED KILT Restaurants (the **"Confidential Information"**). The Franchisor shall disclose the Confidential Information to the AD in the training program, the AD Operations Manual and in guidance furnished to the AD during the term hereof. The AD has not acquired any interest in the Confidential Information, other than the right to utilize it in the Area Developer Area in the execution of the AD's duties hereunder during the term of this Agreement, and the AD acknowledges that the use or duplication of the Confidential Information in any other business venture would constitute an unfair method of competition. The AD acknowledges and agrees that the Confidential Information is proprietary, includes trade secrets of the Franchisor and is disclosed to the AD solely on the condition that the AD agrees, and the AD (and its shareholders, officers, directors, partners, members, managers or equivalents, if the AD is an entity) does hereby agree that the AD: (a) shall not use the Confidential Information in any other business or capacity, except as authorized under the terms of separate written agreements with the Franchisor; (b) shall maintain the absolute confidentiality of the Confidential Information during and for the greater of (i) three years after the term of this Agreement or (ii) three years after the term of all other written Agreements, including all Franchise Agreements to which the AD or its Affiliates and the Franchisor are parties; (c) shall not make unauthorized copies of any portion of the Confidential Information disclosed in written or other tangible form; and (d) shall adopt and implement all reasonable procedures prescribed from time to time by the Franchisor to prevent unauthorized use or disclosure of the Confidential Information. The AD agrees that the Franchisor shall have the perpetual right to use and authorize other TILTED KILT Restaurant franchisees and area developers to use, and the AD shall fully and promptly disclose to the Franchisor, all ideas, concepts, methods and techniques relating to the development and/or operation of a TILTED KILT Restaurant or the AD's activities howsoever conceived or developed by the AD and/or its employees and/or the franchised TILTED KILT Restaurants serviced by the AD during the term of this Agreement.  The AD acknowledges that any such ideas, concepts, methods and techniques shall be the property of the Franchisor and the Franchisor may utilize or disclose such information to franchisees or other agents as it determines to be appropriate.

**11.2.    Nondisclosure and Noncompetition Agreement.**

The Franchisor reserves the right to require that the AD cause each of its shareholders, officers, directors, partners, employees, members, managers and equivalents or, if the AD is an individual, the AD's spouse and its Principal Manager, to execute a Nondisclosure and Noncompetition Agreement in a form approved by the Franchisor.

## 12.    EXCLUSIVE RELATIONSHIP

**12.1.    Exclusive Relationship.**

The Franchisor has entered into this Agreement with the AD on the condition that the AD will deal exclusively with the Franchisor. The AD acknowledges and agrees that the Franchisor would be unable to protect its Confidential Information and would be unable to encourage a free exchange of ideas and information among area developers and the Franchisor if area developers were permitted to hold interests in any Competitive Business, as defined below. The AD therefore agrees that, during the term hereof, neither the AD, the AD's officers, directors, shareholders, members, managers, partners or equivalents who participate in the management of the AD, nor the AD's spouse, and, if applicable, the Principal Manager, shall:

a.    have any direct or indirect interest as a disclosed or beneficial owner in a **"Competitive Business,"** which shall be defined as a business operating or granting franchises or licenses to others to operate, a restaurant or sports entertainment bar or casual dining restaurant offering dinner entrées, traditional pub food, hamburgers, salads or pizza or a combination of such items which if in the same market area as TILTED KILT Restaurants would compete for customers with the Restaurants; or

b.    have any direct or indirect controlling interest as a disclosed or beneficial owner of a Competitive Business; or

c.    perform services as a director, officer, manager, employee, consultant, representative, agent or the equivalent for a Competitive Business; or

d.    divert or attempt to divert any business related to, or any customer or account of, the AD Business, the Franchisor's business or any other TILTED KILT area developer's or Franchisee's business, by direct inducement or otherwise, or divert or attempt to divert the employment of any employee of the Franchisor or another area developer or Franchisee licensed by the Franchisor to any Competitive Business by any direct inducement or otherwise.

Notwithstanding the foregoing, the AD shall not be prohibited from owning securities in a Competitive Business if such securities are listed on a stock exchange or traded on the over-the-counter market and represent 5% or less of that class of securities issued and outstanding. Notwithstanding the foregoing, the AD shall not be prohibited from operation any existing business we have approved in writing as of the effective date of this Agreement **("Existing Business"),** which Existing Business shall be identified and described in Exhibit I.

## 13.    OPERATING STANDARDS

**13.1.    Standards of Service.**

The AD shall at all times give prompt, courteous and efficient service to TILTED KILT Restaurant Franchisees in the ADA. The AD shall, in all dealings with Franchisees, prospective franchisees and the public, adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct.

**13.2.    Compliance with Laws and Good Business Practices.**

The AD shall secure and maintain in force all required licenses, permits and certificates relating to the AD's activities hereunder and shall operate in full compliance with all applicable laws, ordinances and regulations.    The AD acknowledges being advised that many jurisdictions have enacted laws concerning the advertising, sale, renewal, termination and continuing relationship between parties to a franchise agreement, including without limitation, laws concerning disclosure requirements.    The AD agrees promptly to become aware of, and to comply with, all such laws and legal requirements in force in the Area Developer Area and to utilize only offering circulars that the Franchisor has approved for use in the applicable jurisdiction.

**13.3.    Accuracy of Information.**

Before it offers or sells any franchise, the AD shall each time take reasonable steps to confirm that the information contained in any written materials, agreements and other documents related to the offer or sale of franchises is true, correct and not misleading at the time of such offer or sale, and the offer or sale of such franchise will not at that time be contrary to or in violation of any applicable state law related to the registration of the franchise offering.    The Franchisor shall control the use of and shall disseminate all franchise offering circulars and related disclosures and documents and shall provide the AD with information regarding any changes to its disclosure documents and other agreements within a reasonable time after such change.    If the AD notifies the Franchisor of an error in any information in the Franchisor's documents, the Franchisor shall have a reasonable period of time to attempt to correct any deficiencies, misrepresentations or omissions in such information.

**13.4.    Notification of Litigation.**

The AD shall notify the Franchisor in writing within five days of the commencement of any action, suit, arbitration, proceeding or investigation, and of the issuance of any order, writ, injunction, award or decree, by any court, agency or other governmental instrumentality which concerns the operation or financial condition of the AD, the AD's Business or any Franchisee in the Area Developer Area.

**13.5.    Ownership and Management of Business.**

The AD's Business shall at all times be under the direct, day-to-day, full-time supervision of the AD (or, if the AD is a partnership, corporation, limited liability company or other entity, the Principal Manager who shall have been approved by the Franchisor and who shall have satisfactorily completed the Franchisor's training program).    The AD shall at all times during the term of this Agreement own and control the Business authorized hereunder.    Upon the request of the Franchisor, the AD shall promptly provide satisfactory proof of such ownership.    The AD represents that the Statement of Ownership, attached to this Agreement as Exhibit V and incorporated herein by reference, is true, complete, accurate and not misleading.    The AD shall promptly provide the Franchisor with written notification if the information contained in the Statement of Ownership changes at any time during the term of this Agreement and shall comply with the applicable transfer provision contained in Article 15 of this Agreement. If the AD is not an individual, an individual or individuals designated by the Franchisor shall execute the Guaranty and Assumption of AD's Obligations attached hereto as Exhibit IV and incorporated herein by this reference.

17

**13.6.    Conflicting Interests.**

The AD shall at all times faithfully, honestly and diligently perform its obligations hereunder and continuously exert its best efforts to promote, enhance and service TILTED KILT Restaurants in the Area Developer Area. Except for the AD's operation of a TILTED KILT Restaurant, the AD shall not engage in any other business or other activity, directly or indirectly, that requires any significant management responsibility, time commitments, or otherwise may conflict with the AD's obligations hereunder, without the prior written approval of the Franchisor.

**13.7.    Insurance.**

The AD shall at all times during the term of this Agreement maintain in force, at the AD's sole expense, insurance for the AD Business of the types, in the amounts and with such terms and conditions as the Franchisor may from time to time reasonably prescribe in the AD Operations Manual or otherwise. All of the required insurance policies shall name the Franchisor as an additional insured, contain a waiver of the insurance company's right of subrogation against the Franchisor and provide that the Franchisor will receive 30 days' prior written notice of termination, expiration or cancellation of any such policy.

**13.8.    Proof of Insurance Coverage.**

The AD will provide proof of insurance to the Franchisor prior to commencement of operation of its AD Business. This proof will show that the insurer has been authorized to inform the Franchisor in the event any policies lapse or are cancelled. The Franchisor has the right to change the minimum amount of insurance the AD is required to maintain by giving the AD prior reasonable notice, giving due consideration to what is reasonable and customary in similar businesses. Noncompliance with the insurance provisions set forth herein shall be deemed a material breach of this Agreement; and in the event of any lapse in insurance coverage, in addition to all other remedies, the Franchisor shall have the right to demand that the AD cease operations of the AD Business until coverage is reinstated, or, in the alternative, pay any delinquencies in premium payments and charge the same back to the AD. The AD's obligation to obtain and maintain required insurance policies shall not be limited in any way by reason of any insurance maintained by the Franchisor, nor shall the AD's compliance with the insurance provisions in this Agreement relieve the AD of its obligations under Section 18.4 of this Agreement or any insurance requirements under any other agreements with the Franchisor.

**13.9.    Advertising in Marketing Area.**

The AD shall spend at a minimum during each calendar six month period up to $600 per 1,000,000 population on advertising to sell franchises in the Area Developer Area ("**Required Advertising Expenditure**"). Franchisor will waive the foregoing requirement so long as AD meets the development schedule. The population count in the ADA for purposes of calculating the Required Advertising Expenditure shall be designated in Exhibit I. The population count will not change even if the Bureau of Census revises the estimate of the population in the Area Developer Area. The Franchisor, in its sole discretion, may reduce the population count in your ADA used to determine the Required Advertising Expenditure if we determine certain portions of your ADA are not suitable for Restaurant development. The Franchisor may change the amount of the Required Advertising Expenditure (but not to exceed $600 per month per 1,000,000 population in the ADA) by providing the AD with at least 60 days prior written notice. The AD shall submit to the Franchisor an accounting of its Required Advertising Expenditures within 15 days following the end of each calendar period during the term of this Agreement. The Franchisor reserves the right to withhold the payment of commissions on Royalty Fees due to the AD until such time as the Franchisor receives the AD's Required Advertising Expenditure report for all previous six month periods. All advertising and promotion by the AD shall be completely

factual and conform to the highest standards of ethical advertising. The AD agrees to refrain from any business or advertising practice that may be injurious to the Franchisor, the goodwill associated with the Marks or Restaurants.

## 13.10. Approval of Advertising.

Prior to their use by the AD, samples of all advertising and promotional materials not prepared or previously approved by the Franchisor, including, without limitation, Internet advertising on the World Wide Web or other similar network, shall be submitted to the Franchisor for approval, which approval shall not be unreasonably withheld. If written approval is not received by the AD within 15 business days from the Franchisor's receipt of proposed advertising materials, the Franchisor shall be deemed to have disapproved of the proposed materials. The AD shall not use any advertising or promotional materials that the Franchisor has disapproved. The AD acknowledges and understands that certain states require the filing of franchise sales advertising materials with the appropriate state agency prior to dissemination. The AD agrees to fully and timely comply with such filing requirements at the AD's own expense unless such advertising has been previously filed with the state by the Franchisor. The Franchisor may charge the AD, in the Franchisor's sole discretion, for the costs incurred by the Franchisor in printing large quantities of advertising and marketing materials supplied by the Franchisor to the AD at the AD's request.

## 13.11. Accounting, Bookkeeping and Records.

The AD shall maintain at its Business premises in the Area Developer Area all original invoices, receipts, checks, contracts, licenses, acknowledgement of receipt forms and bookkeeping and business records as the Franchisor may require from time to time. The AD shall furnish to the Franchisor, within 90 days after the end of the AD's fiscal year, a balance sheet and profit and loss statement for the AD's Business for such year (or monthly or quarterly statements if required by the Franchisor, in which case such statements shall also reflect year-to-date information). In addition, upon request of the Franchisor, within 10 days after such returns are filed, exact copies of federal and state income, sales and any other tax returns and such other forms, records, books and other information as the Franchisor may periodically require regarding the AD's Business shall be furnished to the Franchisor. The AD shall maintain all records and reports of the Business conducted pursuant to this Agreement for at least five years after the date of termination or expiration of this Agreement.

## 13.12. Reports.

The AD shall, as often as required by the Franchisor, deliver to the Franchisor a written report of its Business activities during such period as required in Sections 9.4 and 9.5 above, in such form and in such detail as the Franchisor may from time to time specify, including information about efforts to solicit prospective Franchisees, the status of pending real estate transactions and the status of the Restaurants in the Area Developer Area. The AD shall, as often as required by the Franchisor, during the term of this Agreement, deliver to the Franchisor the on-site inspection reports required in Section 9.5 above, for each Franchisee in the Area Developer Area, in such form and in such detail as the Franchisor may from time to time specify.

## 13.13. Compliance with Third Party Agreements.

The AD shall comply with all agreements with third parties related to the AD Business including, in particular, all provisions of any premises lease.

19

**13.14. Late Charges.**

The Franchisor reserves the right to automatically assess a $50 late charge for any report or financial statement required under the terms of this Agreement which is not timely filed by the AD. Such late charge shall continue to accrue each month that the late report or financial statement remains unfiled and shall be due and payable in full upon demand by the Franchisor. In the event any late charge is not paid upon demand, the Franchisor may elect to pursue all of its available remedies.

**13.15. Confidential Communications.**

The AD acknowledges and agrees that the AD shall obtain from the Franchisor or from prospective and current Franchisees in the ADA sensitive confidential information consisting of communications between the AD and the Franchisor regarding prospective and existing Franchisees in the ADA, information regarding prospective Franchisees and existing Franchisees in the ADA, and information regarding the TILTED KILT franchise system **("Confidential Communications")**. Except for disclosure of Confidential Communications to the Franchisor or with the prior written consent of the Franchisor, the AD (and its shareholders, officers, directors, partners, members, managers, or equivalent if the AD is an entity) shall not disclose the Confidential Communications to any third parties, including prospective and current Franchisees.

**13.16. Electronic Advertising.**

The AD shall not develop, create, distribute, disseminate or use any Internet advertising or website, or any multimedia, telecommunication, mass electronic mail, facsimile or audio/visual advertising, promotional or marketing materials, directly or indirectly related to the offer or sale of TILTED KILT Restaurant franchises, the Marks or the Licensed Methods ("**Electronic Advertising**"), without the Franchisor's prior written consent, which may be withheld in the Franchisor's sole discretion. The Franchisor shall retain the exclusive right to develop and control the content of all Electronic Advertising for the offer and sale of TILTED KILT Restaurant franchises. The Franchisor reserves the right, upon 30 days' prior written notice, to require the AD to participate in any Electronic Advertising for the offer and sale of TILTED KILT Restaurant franchises sponsored by the Franchisor. If the Franchisor permits the AD to develop any Electronic Advertising, the AD shall do so in compliance with the Franchisor's policies and rules regarding the creation, maintenance, use and content of such Electronic Advertising, as set forth in this Agreement and the AD Operations Manual. The Franchisor may require the AD to link its website to a website as may be maintained by the Franchisor and may also charge the AD a reasonable fee to establish and maintain such link.

## 14. INSPECTIONS AND AUDITS

**14.1. Inspections and Audits.**

To determine whether the AD is complying with this Agreement, the Franchisor or its designee shall have the right at any time during normal business hours, and without prior notice to the AD, to enter onto the premises in which the AD is then keeping its business records and inspect, and conduct an audit of, the business records, bookkeeping and accounting records, invoices, payroll records, time cards, check stubs, bank deposits, receipts, sales tax records and returns and other business records and documents of the AD's Business. The AD and its employees shall fully cooperate with representatives of the Franchisor making, conducting, supervising or observing any such inspection or audit. The Franchisor may require the AD to purchase a computer and modem and to join and pay for an electronic network connection to facilitate the Franchisor's communication with the AD and among all area developers and Franchisees, and to allow the Franchisor unlimited electronic access to the AD's Business records.

## 15. TRANSFERS

### 15.1. Transfers by the Franchisor.

This Agreement is fully transferable by the Franchisor and shall inure to the benefit of any transferee or other legal successor to the Franchisor's interests herein.

### 15.2. Transfers by Area Developer.

The AD agrees that the rights and duties created by this Agreement are personal to the AD (or its officers, directors, shareholders, managers, members, partners or equivalents if the AD is an entity) and that the Franchisor has entered into this Agreement in reliance upon the Franchisor's perceptions of the individual or collective character, skill, aptitude, attitude, business ability and financial capacity of the AD (or its officers, directors, shareholders, members, managers, partners or equivalents). Accordingly, without the prior written consent of the Franchisor, which consent will not be unreasonably withheld, neither this Agreement (or any interest therein), nor any part or all of the ownership of the AD may be transferred. Any unauthorized transfer shall constitute a breach hereof and be void and of no effect. As used in this Agreement, the term "**transfer**" shall mean and include the voluntary, involuntary, direct or indirect assignment, sale, subfranchise, gift or other disposition by the AD (or any of its owners) of any interest in: (1) this Agreement; (2) 25% or more of the ownership interests in the AD; or (3) the assets of the Business.

### 15.3. Conditions for Approval of Transfer.

If the AD (and its officers, directors, managers, owners and equivalents, if the AD is an entity) are in full compliance with this Agreement, the Franchisor shall not unreasonably withhold its approval of a transfer that meets all the applicable requirements of this Section. The proposed transferee and its owners must be individuals of good moral character and otherwise meet the Franchisor's then applicable standards for Area Developers. If the transfer is of this Agreement, a 25% or more ("**Controlling Interest**") interest in the AD, or all or a substantial portion of the assets of the Business, or is one of a series of transfers which in the aggregate constitute the transfer of this Agreement, a Controlling Interest in the AD or all or a substantial portion of the assets of the Business, all of the following conditions must be met prior to or concurrently with the effective date of the transfer:

a. The transferee shall have sufficient business experience, aptitude and financial resources to act as an AD, agree to be bound by all of the terms and conditions of this Agreement and the transferee and/or its Principal Manager must have completed the Franchisor's training program to the Franchisor's satisfaction;

b. The AD shall have paid all fees due hereunder for purchases from the Franchisor and all other amounts owed to the Franchisor or its affiliates and third party creditors and submit to the Franchisor all required reports and statements;

c. The AD or the transferee shall have paid the Franchisor a transfer fee in the amount of $30,000 to defray expenses the Franchisor incurs in connection with the transfer;

d. The AD (and/or its transferring owners) executes a general release, in form satisfactory to the Franchisor, of any and all claims against the Franchisor and its Affiliates and their respective officers, directors, employees, agents or equivalents;

e.    The transferee shall sign an express written assumption of the AD's obligations pursuant to this Agreement, or at the option of the Franchisor, execute an Area Developer Agreement in the form then currently offered by the Franchisor, the term of which will end on the expiration date of this Agreement, and which shall supersede this Agreement in all respects. If a new Area Developer Agreement is signed, the terms may differ from the terms of this Agreement, provided however, the transferee will not be required to pay any additional initial fee;

f.    If the AD (and/or the transferring owners) finances any part of the sale price of the transferred interest, the AD and/or its owners shall have agreed that all obligations of the transferee under any promissory notes, agreements or security interests shall be subordinate to the transferee's obligations to pay fees, and other amounts due to the Franchisor and its Affiliates and otherwise to comply with this Agreement; and

g.    The AD (and/or its transferring owners) shall have executed a noncompetition covenant in favor of the Franchisor and the transferee with terms the same as those set forth in Section 17.5 below.

## 15.4.    Transfer to an Entity.

If the AD is in full compliance with this Agreement, the AD may transfer this Agreement to a corporation or other entity of which the AD owns not less than two-thirds of the ownership interest with the Franchisor's prior written approval, which approval shall not be unreasonably withheld. The transfer fee described in Section 15.3(c) above will be waived by the Franchisor and all owners of such entity shall sign a Guaranty and Assumption of Area Developer's Obligations, attached hereto as Exhibit IV.

## 15.5.    Franchisor's Approval of Transfer.

The Franchisor has 30 days from the date of the written notice to approve or disapprove in writing, of the AD's proposed transfer. Written notice shall mean and include all documentation necessary to evaluate the transferee. The AD acknowledges that the proposed transferee shall be evaluated for approval by the Franchisor based on the same criteria as is currently being used to assess new area developers and new franchisees of the Franchisor and that such proposed transferee shall be provided, if appropriate, with such disclosures as may be required by state or federal law.

## 15.6.    Death or Disability of Area Developer.

Upon the death or permanent disability of the AD (or a Principal Manager of or the owner of a Controlling Interest in the AD), the executor, administrator, conservator, guardian or other personal representative of such person shall transfer his or her interest in this Agreement or such interest in the AD to an approved third party that meets the Franchisor's then current qualification standards for new ADs. Such disposition of this Agreement or such interest (including, without limitation, transfer by bequest or inheritance) shall be completed within a reasonable time, not to exceed six months from the date of death or permanent disability, and shall be subject to all the terms and conditions applicable to transfers contained in this Article. Failure to transfer the interest in this Agreement or such interest in the AD within said period of time shall constitute a breach of this Agreement. For purposes hereof, the term **"permanent disability"** shall mean a mental or physical disability, impairment or condition that prevents the AD, a Principal Manager or an owner of a Controlling Interest in the AD from performing the essential functions of the AD.

**15.7.** **Right of First Refusal.**

In the event the AD wishes to engage in a transfer, the AD agrees to grant to the Franchisor a 30 day right of first refusal to purchase such rights, interest or assets on the same terms and conditions as are contained in the written offer to purchase submitted to the AD by a bona fide proposed purchaser; provided, however, the following additional terms and conditions shall apply:

a.      The AD shall notify the Franchisor of such offer by sending a written notice to the Franchisor (which notice may be the same notice as required by Section 15.5 above), enclosing a copy of the written offer signed by the bona fide proposed purchaser;

b.      The 30 day right of first refusal period will run concurrently with the period in which the Franchisor has to approve or disapprove the proposed transferee;

c.      Such right of first refusal arises for each proposed transfer and any material change in the terms or conditions of the proposed transfer, even if to the same bona fide proposed purchaser, shall be deemed a separate offer for which a new 30 day right of first refusal shall be given to the Franchisor;

d.      If the consideration or manner of payment offered by a third party is such that the Franchisor may not reasonably be required to furnish the same, then the Franchisor may purchase the interest which is proposed to be transferred for the reasonable cash equivalent. If the parties cannot agree within a reasonable time on the cash consideration, an independent appraiser shall be designated by the Franchisor, whose determination will be binding upon the parties. All expenses of the appraiser shall be paid for equally between the Franchisor and the AD; and

e.      If the Franchisor chooses not to exercise its right of first refusal, the Franchisee shall be free to complete the transfer, subject to compliance with Sections 15.3 and 15.5 above. Absence of a reply to the AD's notice of a proposed transfer within the 30 day period is deemed a waiver of such right of first refusal.

## 16.   TERM AND EXPIRATION

**16.1.** **Term.**

The term of this Agreement is for a period of 25 years from the date of this Agreement, unless sooner terminated as provided herein.

**16.2.** **Rights Upon Expiration.**

At the end of the initial term, the AD shall have the option to renew its area developer rights for one additional term of 10 years, by acquiring successor area developer rights, if the Franchisor authorizes a successor area developer in accordance with Section 16.3 below, and if the AD:

a.      At least 60 days prior to expiration of the term, executes the form of Area Developer Agreement then in use by the Franchisor; provided that such agreement may not contain terms which are materially different from those in this Agreement, including commission percentages and territories;

b.      Has complied with all provisions of this Agreement during the current term, including the payment on a timely basis of all fees due hereunder. **"Compliance"** shall mean, at a

minimum, that the AD has not received written notification from the Franchisor of breach hereunder more than three times during the term hereof;

c. Executes a general release, in a form satisfactory to the Franchisor, of any and all claims against the Franchisor and its affiliates, and their respective officers, directors, employees and agents, successors and assigns, arising out of or relating to this Agreement; and

d. Has agreed with the Franchisor on new Sales and Development Goals for the additional term at least 60 days prior to expiration of the term.

**16.3.    Exercise of Option for Successor Area Developer Rights.**

The AD may exercise its option for successor area developer rights by giving written notice of such exercise to the Franchisor not less than 120 days nor more 180 days prior to the scheduled expiration of this Agreement. The AD's successor area developer rights shall become effective by signing the Area Developer Agreement then currently being offered by the Franchisor; however, if the AD fails to sign the general release and the Area Developer Agreement within 60 days after delivery thereof to the AD, AD shall be deemed to have elected not to acquire a successor area developer franchise.

**16.4.    Conditions of Refusal.**

The Franchisor shall not be obligated to offer the AD successor area developer rights upon the expiration of this Agreement if the AD fails to comply with any of the above conditions of renewal. In such event, except for failure to execute the then current Area Developer Agreement, the Franchisor shall give the AD notice of expiration not more than 90 days after the Franchisor receives the AD's notice, and such notice shall set forth the reasons for such refusal to offer successor area developer rights. Upon the expiration of this Agreement, the AD shall comply with the provisions of Section 17.3 below.

## 17.    TERMINATION

**17.1.    By Area Developer.**

The AD may terminate this Agreement at any time during the term hereof with 180 days advance written notice to the Franchisor.

**17.2.    By Franchisor.**

The Franchisor shall have the right to terminate this Agreement effective upon delivery of written notice of termination to the AD, unless otherwise noted below (subject to any state laws to the contrary, where state law shall prevail) if the AD (and/or any of its Affiliates, shareholders, members, managers, Principal Managers, partners or equivalents):

a. Fails to satisfactorily complete the training program as provided in Section 7.1 of this Agreement;

b. Has made any material misrepresentation or omission in its application to be an AD;

c. Fails to meet the Sales and Development Goals set forth in Exhibit I within 30 days after written notice of such failure is delivered to the AD;

d.      Fails to comply with any other provision of this Agreement or any mandatory specification, standard or operating procedure prescribed by the Franchisor and does not correct such failure within 30 days after written notice of such failure to comply is delivered to the AD;

e.      Surrenders, transfers control of or makes an unauthorized transfer of this Agreement or an ownership interest in the AD;

f.      Is convicted by a trial court of or pleads no contest to a felony, or to any other crime or offense that is, in the opinion of the Franchisor, likely to adversely affect the goodwill associated with the Marks, or engages in any conduct which may adversely affect the reputation of TILTED KILT Restaurants or the goodwill associated with the Marks;

g.      Is declared bankrupt or insolvent or voluntarily institutes a bankruptcy proceeding under the Bankruptcy Code or is adjudicated bankrupt as a result of an involuntary petition in bankruptcy being filed against it.  (This provision may not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.);

h.      Abandons or ceases to operate the AD Business for a period of 15 consecutive days or any shorter period that indicates an intent by the AD to discontinue operation of the AD Business unless precluded from doing so by an event beyond the AD's reasonable control, other than for financial reasons;

i.      Has received three notices of default from the Franchisor within a 12 month period, regardless of whether the defaults were cured by the AD;

j.      Makes any unauthorized use of the Marks or unauthorized use or disclosure of the Confidential Information, or uses, duplicates or discloses any part of the AD Operations Manual; or

k.      Has terminated a Franchise Agreement between the Franchisor and the AD or its Affiliate, or if the Franchisor has terminated such a Franchise Agreement.

**17.3.    Rights and Obligations of the Area Developer Upon Termination or Expiration.**

Upon termination of this Agreement, whether pursuant to Section 17.1, 17.2 or upon expiration of this Agreement pursuant to Article 16 above, the AD agrees:

a.      To pay the Franchisor within 15 days after the effective date of termination or expiration of this Agreement, or such later date that the amounts due to the Franchisor are determined, such fees, amounts owed for purchases by the AD from the Franchisor or its Affiliates, interest due on any of the foregoing and all other amounts owed to the Franchisor or its affiliates or designees which are then unpaid;

b.      To refrain from, directly or indirectly at any time or in any manner (except with respect to TILTED KILT Restaurant franchises owned and operated by the AD) identifying itself or any business as a current or former AD or authorized agent of the Franchisor or its Affiliates, use any Mark, any colorable imitation thereof or other indicia of a TILTED KILT Restaurant in any manner or for any purpose or utilize for any purpose any trade name, trademark or service mark or other commercial symbol that suggests or indicates a connection or association with the Franchisor or its affiliates;

c.      To immediately deliver to the Franchisor all past and present franchise sales leads and records and all contracts, acknowledgements of receipt, and other information and records related to Franchisees of the Franchisor in the ADA;

d.      To immediately deliver to the Franchisor all advertising materials, the AD Operations Manual, all other manuals, forms, offering circulars, franchise sales brochures and other materials containing any Mark or otherwise identifying or relating to the sale or service of TILTED KILT Restaurants;

e.      To refrain from communicating, in any manner, with Franchisees, except as expressly authorized by the Franchisor;

f.      To take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to the AD's use of any Mark;

g.      To notify the telephone company and all telephone directory publishers of the termination or expiration of the AD's right to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer thereof to the Franchisor or its designee. The AD acknowledges that, as between it and the Franchisor, the Franchisor has the sole rights to and interest in all telephone, telecopy or facsimile machine numbers and directory listings associated with any Mark. The AD authorizes the Franchisor, and hereby appoints the Franchisor and any of its officers as the AD's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any telephone, telecopy or facsimile machine numbers and directory listings relating to the AD's Business to the Franchisor at its direction, should the AD fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive evidence of the Franchisor's exclusive rights in such telephone numbers and directory listings and the Franchisor's authority to direct their transfer;

h.      If applicable, take such action as may be required to remove from the Internet all the sites referring to the AD's former Business or any Mark and to cancel or assign to the Franchisor, in the Franchisor's sole discretion, all rights to any domain names for any sites on the Internet that refer to the AD's former AD Business or any mark, except with respect to TILTED KILT Restaurant franchises owned and operated by the AD; and

i.      Furnish the Franchisor, within 30 days after the effective date of termination or expiration, with evidence satisfactory to the Franchisor of the AD's compliance with the foregoing obligations.

j.      It is the intent of the AD and TKFO that AD be protected from losing AD's rights to fees and royalties from the then existing franchise restaurants in the Territory in the event that TKFO files a petition for Chapter 7 bankruptcy. Subject to all applicable bankruptcy laws, and so long as this provision does not limit TKFO's rights to collect fees and royalties directly from any franchisee outside of a bankruptcy proceeding, TKFO shall execute such documents as the AD shall reasonably request in order to establish the AD's right to fees and royalties, and AD's right to collect all such fees and royalties directly from the franchisees in AD's Territory in the event that TKFO should file a Chapter 7 bankruptcy petition.

## 17.4.   Confidential Information.

AD agrees that, upon termination or expiration of this Agreement, the AD shall immediately cease to use any Confidential Information of the Franchisor pursuant to this Agreement in any business or otherwise (except in connection with the operation of a TILTED KILT Restaurant pursuant to a Franchise Agreement with the Franchisor) and return to the Franchisor all copies of the AD Operations Manual and any other confidential materials which have been loaned to the AD by the Franchisor.

## 17.5.   Covenant Not to Compete.

Upon termination or expiration of this Agreement for any reason, the AD (and its Affiliates, shareholders, officers, directors, members, managers, partners and/or equivalents if the AD is a corporation, partnership, limited liability company or other entity) agrees that, for the greater of a period of three years commencing on the effective date of termination or expiration, or the date on which the AD ceases to conduct business, whichever is later, the AD (and its shareholders, officers, directors, members, managers, partners and/or equivalents if the AD is an entity) shall not have any direct or indirect interest (through a member of any immediate family of the AD or its Affiliates, officers, directors, shareholders, partners, members, managers or otherwise) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Business located or operating within the Area Developer Area. The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent 5% or less of the number of shares of that class of securities issued and outstanding. The AD (and its Affiliates, shareholders, officers, directors, members, managers, partners and/or equivalents) expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.

## 17.6.   No Further Right to Payment.

Upon termination or expiration of this Agreement, the AD forfeits all fees paid to the Franchisor and remains liable to the Franchisor for all amounts due to the Franchisor on the date of termination or expiration. The AD shall have no further right to receive payment of commissions on Royalty Fees, except as set forth below, or on initial franchise fees from the Franchisor, except for those commissions on Royalty Fees or on initial franchise fees which have been fully earned by the AD up through the date of such termination or expiration. For purposes of this Agreement, "fully earned" commissions shall mean commissions due on franchise sales for which all conditions described in Section 6.1 of this Agreement have been met or fulfilled by the AD for the purchase of a franchise for a TILTED KILT Restaurant to be located within the ADA. "Fully earned" commissions on initial franchise fees and commissions on Royalty Fees shall mean those commissions which accrue up through the date of termination which are otherwise owed to the AD. The Franchisor shall have the right to immediately assume control of and manage all franchise sales in the ADA and to receive all commissions on initial franchise fees and commissions on Royalty Fees from Franchisees in the ADA. Any fully earned commissions which are due to the AD will be paid by the Franchisor in accordance with the provisions of Article 6 of this Agreement. As of the effective date of termination of the AD Agreement, the AD shall continue to receive one-half (16.5% instead of 33%) of the commissions on Royalty Fees that the AD was receiving as an AD during the remainder of the initial term of this Agreement. The right to receive payment of the reduced commissions on Royalty Fees is conditioned upon compliance by the AD with the post termination obligations set forth in Section 17.3 above and compliance with all other obligations of the AD under this Agreement which expressly or by their nature survive termination. The right of the AD to receive reduced commissions on Royalty Fees only applies to those Royalty Fees paid to and received by the Franchisor pursuant to Franchise Agreements for Restaurants operated by Franchisees in the ADA as of the effective date of termination of this Agreement.

No reduced commissions on Royalty Fees shall be paid to AD at any time after the effective date of termination of this Agreement in connection with Restaurants under development and not yet operating in the ADA as of the effective date of termination or for Restaurants to be developed in the ADA after the effective date of termination of this Agreement. The obligation of the Franchisor to pay reduced commissions on Royalty Fees received pursuant to Franchise Agreements for Restaurants operating in the ADA as of the effective date of termination of this Agreement and otherwise in accordance with the terms and conditions described above in this Section 17.6, shall cease upon the transfer, termination or non-renewal of such Franchise Agreements.

**17.7.    Continuing Obligations.**

All obligations of the Franchisor and the AD which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied or by their nature expire.

**17.8.    State and Federal Law.**

THE PARTIES ACKNOWLEDGE THAT IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN THE AD'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

## 18.    RELATIONSHIP OF THE PARTIES

**18.1.    Relationship of the Parties.**

It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them, that the parties are independent contractors and that the Franchisor appoints the AD as its special agent for a particular purpose and that nothing in this Agreement is intended to make either party a general agent, subsidiary, joint venturer, partner, employee or servant of the other for any purpose. The AD shall conspicuously identify itself in all dealings with Franchisees, prospective franchisees, lessors, contractors, suppliers, public officials and others as the owner of its own Business under an Area Developer Agreement with the Franchisor, and shall place such other notices of independent ownership on signs, forms, stationery, advertising and other materials as the Franchisor may require from time to time.

**18.2.    Payment of Third Party Obligations.**

Neither the Franchisor nor the AD shall make any express or implied agreements, guaranties or representations, or incur any debt, in the name of or on behalf of the other or represent that their relationship is other than franchisor and special agent, and neither the Franchisor nor the AD shall be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized hereunder or under a separate written agreement with the Franchisor, nor shall the Franchisor be obligated for any damages to any person or property directly or indirectly arising out of the operation of the AD's Business, whether or not caused by the AD's negligent or willful action or failure to act.

**18.3.** **Independent Contractors.**

The AD may delegate its duties hereunder to independent contractors provided that the AD receives written approval from the Franchisor prior to any such delegation of duties and complies with all state laws which require broker registration for such persons. The Franchisor reserves the right to withdraw the approval of any independent contractor engaged by the AD to fulfill its duties and obligations under this Agreement, at any time.

**18.4.** **Indemnification.**

The AD agrees to indemnify and hold the Franchisor and its subsidiaries, Affiliates, stockholders, directors, officers, employees, agents and assignees harmless against, and to reimburse them for, any loss, liability, taxes or damages (actual or consequential) and all reasonable costs and expenses of defending any claim brought against any of them or any action in which any of them is named as a party (including, without limitation, reasonable accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses) which any of them may suffer, sustain or incur by reason of, arising from or in connection with any acts, omissions or activities of the AD or any employee of or independent contractor engaged by the AD, whether such acts, omissions or activities are authorized by or are not in accordance with this Agreement. The Franchisor shall have the right to defend any such claim against it. This indemnity shall continue in full force and effect, subsequent to and notwithstanding the expiration or termination of this Agreement.

## 19. MEDIATION

**19.1.** **Mediation**

Except as provided in Section 19.2 with regard to bringing a civil action relating to the Marks, enforcement of a covenant not to compete or any lease or sublease of real estate and Section 19.3 in regard to injunctive relief, no party shall file a legal action seeking enforcement or any other legal remedy relating to or arising under this Agreement until the dispute has been submitted to a non-binding mediation proceeding conducted in accordance with the procedures set forth below.

a. Either party may initiate a mediation proceeding (the "**Initiating Party**") by notifying the other party in writing (the "**Responding Party**"). The mediation shall be conducted in accordance with the American Arbitration Association's ("**AAA**") then current mediation rules, but need not be administered by the AAA unless the parties cannot agree upon the selection of a mediator within thirty days of the receipt of the written demand for mediation. If the parties cannot reach agreement upon the selection of a mediator, either party may commence the mediation process by filing a written demand for mediation with the AAA, with a copy to the other party. The notice shall describe with specificity the nature of the dispute and Initiating Party's claim for relief. Both parties will be obligated to engage in the mediation under the AAA's then current rules, except to the extent the rules conflict with this Agreement, in which case this Agreement shall control.

b. The mediation will be conducted by a single mediator with no past or present affiliation or conflict with the Franchisor, the AD, or any other party to the mediation. The parties agree that the mediator shall be disqualified as a witness, expert, consultant or attorney in any pending or subsequent proceeding relating to the dispute which is the subject of the mediation.

c.      In the event the parties cannot agree on a mediator and the AAA administers the mediation, the AAA shall provide the parties with a list of mediators willing to serve. If the parties do not agree upon a mediator, and so advise the AAA in writing, within 10 days of receipt of such list, the AAA shall appoint the mediator. The fees and expenses of the AAA, if applicable, and the mediator's fee, shall be shared equally by the parties. Each party shall bear its own attorneys' fees and other costs incurred in connection with the mediation irrespective of the outcome of the mediation or the mediator's evaluation of each party's case.

d.      The mediation proceeding shall commence within 30 days after selection of the mediator. Regardless of whether the Franchisor or the AD is the Initiating Party, the mediation shall be conducted at the Franchisor's principal offices, unless the Franchisor and the AD agree upon a mutually acceptable alternative location.

e.      At least 7 days before the first scheduled session of mediation, each party shall deliver to the mediator and to the other party a concise written summary of its position with respect to the matters in dispute and Initiating Party's claims for relief, and such other matters required by the mediator.

f.      The parties shall participate in good faith in the mediation with the intention of resolving the dispute, if at all possible. The parties recognize and agree, however, that the mediator's recommendations and decision shall not be binding on the parties unless otherwise agreed in writing.

g.      During the mediation, the mediator may have joint and separate meetings with the parties and their counsel, at the mediator's discretion. The mediation proceeding shall continue until conclusion, which is deemed to occur when: (i) a written settlement is reached, (ii) the mediator concludes and informs the parties in writing that further efforts would not be useful, or (iii) the parties agree in writing that an impasse has been reached. Neither party may withdraw before the conclusion of the mediation proceeding.

h.      The mediation proceeding will be treated as a compromise settlement negotiation. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation proceeding by any party or their agents, experts, counsel, employees or representatives, and by the mediator are confidential. Such offers, promises, conduct and statements may not be disclosed to any third party and are privileged and inadmissible for any purpose, including impeachment, under applicable laws or rules of evidence; provided however, that evidence otherwise discoverable or admissible shall not be rendered not discoverable or inadmissible as a result of its use in the mediation. If a party informs the mediator that information is conveyed in confidence by the party to the mediator, the mediator will not disclose the information.

**19.2.    Governing Law/Consent to Venue and Jurisdiction/Waiver of Jury Trial.**

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.), the Federal Arbitration Act, or other federal law, this Agreement shall be interpreted under the laws of the state of Arizona and any dispute between the parties shall be governed by and determined in accordance with the substantive laws of the state of Arizona, which laws shall prevail in the event of any conflict of law. The AD and the Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving the AD, its officers, directors, managers or partners (collectively, **"AD Affiliates"**) and the

Franchisor, its officers, directors or sales employees (collectively, "**Franchisor Affiliates**") the parties agree that the exclusive venue for disputes between them shall be in the state and federal courts of Arizona and each party waives any objection they may have to the personal jurisdiction of or venue in the state and federal courts of Arizona. The Franchisor, the Franchisor Affiliates, the AD and the AD Affiliates each waive their rights to a trial by jury.

**19.3.    Injunctive Relief.**

Notwithstanding the above provision for mediation, the Franchisor and the AD will each have the right in a proper case to obtain injunctive relief and any damages incidental thereto from a court of competent jurisdiction. The AD agrees that the Franchisor may obtain such injunctive relief, without posting a bond or bonds in excess of a total of $1,000, but upon due notice, and the AD's sole remedy in the event of the entry of such injunctive relief will be the dissolution of such injunctive relief, if warranted, upon hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by the Franchisee. Any such action will be brought as provided in Section 19.1 above and the prevailing party shall be entitled to its costs and attorneys' fees.

## 20.    MISCELLANEOUS PROVISIONS

**20.1.    Invalidity.**

If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element and, as so modified, such provision shall be deemed a part of this Agreement as though originally included. The remaining provisions of this Agreement shall not be affected by such modification.

**20.2.    Modification.**

The Franchisor and/or the AD may modify this Agreement only upon execution of a written agreement between the two parties. The AD acknowledges that the Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the AD Operations Manual unilaterally under any conditions and to the extent to which the Franchisor, in its sole discretion, deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods, but under no circumstances will such modifications be made arbitrarily without such determination.

**20.3.    Attorneys' Fees.**

In the event of any default on the part of either party to this Agreement, which is not resolved in accordance with Section 19.1 hereof, in addition to all other remedies, the party in default will pay the aggrieved party all amounts due and all damages, costs and expenses, including reasonable attorneys' fees, incurred by the aggrieved party in any legal action, arbitration or other proceeding as a result of such default, plus interest at the lesser of 18% per annum or the highest rate allowable by law, accruing from the date of such default.

**20.4.    No Waiver.**

No waiver of any condition or covenant contained in this Agreement or failure to exercise a right or remedy by the AD or the Franchisor shall be considered to imply or constitute a further waiver by the Franchisor or the AD of the same or any other condition, covenant, right, or remedy.

**20.5.  No Right to Set Off.**

The AD shall be allowed to set off amounts owed to the Franchisor for fees or other amounts due hereunder, against any monies owed to the AD, nor will the AD in any event withhold any amounts due to any alleged nonperformance by the Franchisor hereunder, which right of set off is hereby expressly waived by the AD.

Effective Date.

Regardless of the date first written above, this Agreement shall not be effective until executed by the Franchisor as evidenced by dating and signing by an officer of the Franchisor.

**20.6.  Review of Agreement.**

The AD acknowledges that it had a copy of the Franchisor's Uniform Franchise Offering Circular in its possession for a period of time not less than 10 full business days, and this Agreement in its possession for a period of time not less than 5 full business days, during which time the AD has had the opportunity to submit the same for review and advice by a professional of the AD's choosing prior to freely executing this Agreement.

**20.7.  Entire Agreement.**

This Agreement (which includes the attachments and Exhibits expressly incorporated herein), and, if applicable, one or more Franchise Agreements and Development Agreements, contains the entire agreement between the parties and supersedes any and all prior agreements concerning the subject matter hereof. The AD agrees and understands that the Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution hereof and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. The Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. The AD further acknowledges and agrees that no representations have been made to it by the Franchisor regarding projected sales volumes, market potential, revenues, profits of the AD's Business, or operational assistance other than as stated in this Agreement or in any disclosure document provided in connection herewith.

**20.8.  Notices.**

All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by an overnight delivery service providing documentation of receipt, to the addresses set forth in the first paragraph of this Agreement, or, with respect to notices to the AD, to the address of the Area Developer Business, or at such other addresses as the Franchisor or the AD may designate from time to time, and shall be effectively given when deposited in the United States mails, postage prepaid, or when received via overnight delivery, as may be applicable.

**20.9.  Payment of Taxes.**

The AD shall reimburse the Franchisor, or its Affiliates and designees, promptly and when due, the amount of all sales taxes, use taxes, personal property taxes and similar taxes imposed upon, required to be collected or paid by the Franchisor, or its Affiliates or designees, on account of services or goods furnished by the Franchisor, its Affiliates or designees, to the AD through sale, lease or otherwise (except any taxes the Franchisor or its Affiliates are required by law to collect from the AD with respect to products purchased from the Franchisor and its Affiliates), or on account of collection by the Franchisor

of the Initial Area Developer Fee, Existing Franchisee Fee or any other payment made by the AD to the Franchisor required under the terms of this Agreement.

**20.10.  Cumulative Rights.**

The rights and remedies of the Franchisor and the AD hereunder are cumulative and no exercise or enforcement by the Franchisor or the AD of any right or remedy hereunder shall preclude the exercise or enforcement by the Franchisor or the AD of any other right or remedy which the Franchisor or the AD is entitled by law to enforce.

**20.11.  Acknowledgment.**

BEFORE SIGNING THIS AGREEMENT, THE AD SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.  THE AD ACKNOWLEDGES THAT:

(A) THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON THE AD'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B) NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C) NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY OFFERING CIRCULAR SUPPLIED TO THE AD IS BINDING ON THE FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

**IN WITNESS WHEREOF,** the parties hereto have executed, sealed and delivered this Agreement in counterparts on the date first mentioned above.

**TILTED KILT FRANCHISE OPERATING, LLC**

By: _____

Title: _____

Date: _____

**AREA DEVELOPER:**

1220, LLC

By: _____ ANTHONY BROWN

Title: _____ MEAGING MEMBER

Date: _____ 07 30 07

(2/06)

33